The summaries of the Colorado Court of Appeals published opinions constitute no part of the opinion of the division but have been prepared by the division for the convenience of the reader. The summaries may not be cited or relied upon as they are not the official language of the division. Any discrepancy between the language in the summary and in the opinion should be resolved in favor of the language in the opinion.

SUMMARY
August 20, 2020

## 2020COA126

**No. 19CA0356, *Trujillo v. Vail Clinic* — Evidence — Testimony by Experts**

A division of the court of appeals addresses whether the trial court erred by ruling that expert testimony about Cranial Compression Ischemic Encephalopathy (CCIE) was inadmissible under CRE 702. The division concludes that because CRE 702's liberal admission standard requires only that expert testimony be reasonably reliable and any expert testimony will be further vetted at trial by cross-examination and the presentation of contrary testimony, the CCIE testimony here was admissible.

COLORADO COURT OF APPEALS                                    **2020COA126**

Court of Appeals No. 19CA0356
Eagle County District Court No. 14CV30248
Honorable Russell H. Granger, Judge

Brandon Trujillo, by and through his Co-Conservators; Rosalina Chaparro-
Leyva; and Victor Trujillo,

Plaintiffs-Appellants,

v.

Vail Clinic, Inc., d/b/a Vail Valley Medical Center; Pamela Bock; Gale Santa
Maria,

Defendants-Appellees.

JUDGMENT REVERSED AND CASE
REMANDED WITH DIRECTIONS

Division II
Opinion by JUDGE PAWAR
Román and Tow, JJ., concur

Announced August 20, 2020

Leventhal Puga Braley P.C., James E. Puga, Molly I. Greenblatt, Benjamin I.
Sachs, Denver, Colorado; Levin Sitcoff PC, Bradley A. Levin, Nelson A. Waneka,
Denver, Colorado, for Plaintiffs-Appellants

Hershey Decker Drake, P.L.L.C., C. Todd Drake, Lone Tree, Colorado, for
Defendants-Appellees

¶ 1    During plaintiff Brandon Trujillo's birth in 2013, he suffered injuries that reduced the supply of oxygen to his brain and left him with permanent disabilities.  He and his parents, Rosalina Chaparro-Leyva and Victor Trujillo, the plaintiffs in this case, sued defendant health care providers for causing these injuries.  Before trial, the district court excluded testimony from plaintiffs' experts about plaintiffs' theory of causation.  The court held that although the scientific principles underlying the theory were reliable, the theory itself was not because it had not been tested, been published in peer-reviewed publications, or gained widespread acceptance in the medical field.  Based on this ruling, the court granted defendants summary judgment, holding that without the excluded testimony, plaintiffs could not prove that defendants caused Brandon's injuries.  We conclude that the district court erred by excluding the expert testimony.  We therefore reverse and remand with directions.

## I.  Background

¶ 2    After being admitted to Vail Clinic, Inc., d/b/a Vail Valley Medical Center, for a scheduled induction, Brandon's mother labored for thirty-two hours until Brandon was delivered via

Cesarean section.  For the vast majority of the labor, Brandon's mother received Pitocin, a medication that induces contractions.

¶ 3     When Brandon was born, he was not breathing and required cardiac resuscitation.  He was subsequently diagnosed with having suffered injuries during labor and delivery that significantly reduced the blood supply, and therefore oxygen supply, to his brain. Brandon now suffers from cerebral palsy, a permanent condition.

¶ 4     Brandon and his parents sued defendants, alleging that their professional negligence caused the injuries that led to Brandon's cerebral palsy.  They disclosed several experts who were prepared to testify about what caused the reduction of the blood supply, and therefore the oxygen supply, to Brandon's brain.

¶ 5     According to these experts, excessively strong, prolonged, and frequent contractions can increase the external pressure on a fetus's head to the point that the pressure collapses the blood vessels in the fetus's head, thereby preventing sufficient blood and associated oxygen from being circulated to the brain.  For ease of reference in this opinion, we, like the district court, will refer to this

phenomenon as Cranial Compression Ischemic Encephalopathy (CCIE).[1]

¶ 6   Plaintiffs' experts would have opined not only about CCIE generally, but that based on a differential diagnosis (diagnosis by process of elimination), CCIE caused Brandon's injuries.  They would have further opined that defendants' repeated administration of Pitocin over a prolonged period and failure to deliver Brandon by Cesarean section sooner contributed to his injuries.

¶ 7   Before trial, defendants moved to limit the testimony of plaintiffs' experts, arguing that CCIE was not a scientifically proven phenomenon and therefore any testimony about it generally or as the cause of Brandon's injuries was inadmissible under CRE 702. The district court held a multi-day hearing on this issue and ultimately granted defendants' motion in an extensive and helpful (for appellate purposes) written order.  The court ruled that the CCIE testimony was neither reasonably reliable, helpful to the jury, nor admissible under CRE 403.

---

[1] Ischemia is a restricted blood supply to tissue and encephalopathy refers to damage to the brain.  Therefore, in layman's terms, CCIE means a brain injury caused by cranial compression that reduces blood flow to the brain.

¶ 8 Defendants then moved for summary judgment, arguing that because CCIE was plaintiffs' only theory of causation and all testimony about it had been ruled inadmissible, plaintiffs could not prove that defendants caused Brandon's injuries. The district court granted this motion too, agreeing with defendants that without the CCIE testimony, plaintiffs could not establish causation as a matter of law.

¶ 9 On appeal, plaintiffs argue that the district court erred by excluding the CCIE testimony. They also argue that even if the district court properly excluded the CCIE testimony, defendants were still not entitled to summary judgment. We agree with plaintiffs that the district court should not have excluded the CCIE testimony and on that basis conclude that the court erred by granting defendants summary judgment.

## II. Excluded Expert Testimony

¶ 10 We review the district court's exclusion of the CCIE expert testimony for an abuse of discretion. *See Estate of Ford v. Eicher*, 250 P.3d 262, 266 (Colo. 2011). A court's ruling on the admissibility of expert testimony is an abuse of discretion if it is manifestly erroneous. *Id.*

## A. Governing Law

¶ 11    CRE 702 provides for the admission of expert testimony, which the rule defines as testimony based on scientific, technical, or other specialized knowledge. Expert testimony may be admitted under CRE 702 only if it is both reliable and relevant. *See Ford*, 250 P.3d at 266. To determine whether the testimony is reliable, courts consider whether "(1) the scientific principles underlying the testimony are reasonably reliable [and] (2) the expert is qualified to opine on such matters." *Id.*; *see People v. Shreck*, 22 P.3d 68, 77 (Colo. 2001). Expert testimony is relevant if it would be helpful to the jury and satisfies CRE 403 (probative value of the evidence cannot be substantially outweighed by the danger of unfair prejudice). *See Ford*, 250 P.3d at 266.

¶ 12    In conducting the reliability inquiry, there is no mandatory list of factors that a court must consider. *See Kutzly v. People*, 2019 CO 55, ¶ 12. Many courts, including the district court here, have assigned determinative weight to some or all of the factors identified in *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 593-95 (1993). But our supreme court has repeatedly made clear that whether "expert testimony is reasonably reliable requires

considering the totality of the circumstances surrounding the proposed expert testimony and is not contingent on any specific list of factors." *Kutzly*, ¶ 12.

¶ 13    Our supreme court has also emphasized that CRE 702 requires only that "the underlying scientific principles are *reasonably* reliable." *Id.* The standard for admitting expert testimony is liberal because any admitted testimony will be further vetted through vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof. *Shreck*, 22 P.3d at 78. The trial court's inquiry is focused on excluding junk science, recognizing that two experts may have conflicting but nevertheless equally admissible opinions on a particular issue. *See Estate of Ford v. Eicher*, 220 P.3d 939, 942 (Colo. App. 2008), *aff'd*, 250 P.3d 262 (Colo. 2011); *Farmland Mut. Ins. Cos. v. Chief Indus., Inc.*, 170 P.3d 832, 835 (Colo. App. 2007). In this way, a trial court acts only as a gatekeeper, not the arbiter of which expert's opinion is true or more credible.

¶ 14    The trial court found, and the parties do not dispute, that plaintiffs' experts were qualified to give the opinions they offered. We agree. We therefore focus our attention on the contested issue

of the trial court's determinations that any testimony about CCIE generally or as applied to Brandon was not reasonably reliable, helpful to the jury, or compliant with CRE 403.

## B. General CCIE Testimony was Reasonably Reliable

¶ 15    The expert testimony excluded here was that excessively long, frequent, and powerful uterine contractions during labor can increase the intrauterine pressure on a fetus's head to the point that it collapses the fetus's blood vessels in the head and causes an ischemic brain injury (CCIE). Plaintiffs' experts conceded that this concept was not widely accepted in the medical field and had not been published in peer-reviewed journals. On the other hand, during the hearing, plaintiffs' expert Dr. Barry Schifrin testified that the following underlying pathophysiological concepts *were* widely accepted in the medical field, taught in medical schools, and published in peer-reviewed journals: (1) excessive external pressure on blood vessels can collapse them and cause ischemic injuries; (2) during a contraction, the intrauterine pressure on a fetus increases; and (3) in response to this rise in external pressure, a fetus raises its own internal blood pressure to ensure that blood circulates to

tissues and organs. The district court found that these concepts were reasonably reliable.

¶ 16   Put differently, it was beyond dispute that contractions pressurize a fetus's blood vessels. It was also beyond dispute that to prevent those blood vessels from collapsing and causing an ischemic injury, a fetus raises its own blood pressure, effectively overcoming the external pressure of a contraction. The only piece of plaintiffs' experts' testimony that the trial court found unreliable was that the extracranial pressure of a contraction can raise the intracranial pressure on a fetus's blood vessels to the point that a fetus cannot sufficiently raise its blood pressure to counteract it, resulting in the intracranial blood vessels' collapse and the brain being deprived of necessary blood (and the oxygen it carries). Dr. Schifrin, a highly credentialed and experienced expert in maternal fetal medicine with years of experience researching the mechanism of injury for fetal brain damage, testified that this was possible. Defendants' experts, also highly credentialed and experienced in the field, testified that it was not possible.

¶ 17   The trial court effectively resolved this conflict in the testimony by determining that defendants' experts' opinions were reliable

while those of Dr. Schifrin and plaintiffs' other experts were not. In its order, the trial court discussed CCIE in terms of building blocks being added together to form the theory of CCIE. The trial court recognized that all of the building blocks were reasonably reliable and widely accepted in the medical community. But the court held that "support for each block is not the same as support for the theory." The court wrote, correctly, that the assembly of these building blocks into the theory of CCIE had not been published in a peer-reviewed journal, was not taught in medical schools, had not been tested, and was not generally accepted or known in the medical field. The court therefore held that the theory was not scientifically reliable.

¶ 18    The trial court went to admirable lengths to learn about this technical medical subject. But we conclude that the trial court exceeded the bounds of its role as a gatekeeper charged only with keeping junk science from the jury. As mentioned above, the standard for admitting expert testimony is liberal because any expert opinion will be subject to further vetting at trial. Consequently, it is not for the trial court to determine whether an expert opinion is unimpeachable. To be admissible, expert opinion

9

need only be reasonably reliable based on the totality of the circumstances.

¶ 19 The trial court erroneously put determinative weight on the fact that CCIE, as a complete theory, had not been tested, widely accepted in the medical field, or published in peer-reviewed journals. While these factors were certainly appropriate for the court to consider, the totality of the circumstances also included the reliability of the underlying pathophysiological mechanisms and concepts on which CCIE is based. This underlying pathophysiology, combined with Dr. Schifrin's testimony that the pathophysiology was consistent with and supported the validity of CCIE, rendered CCIE reasonably reliable in the context of the liberal admission standard for expert testimony.

¶ 20 While CCIE is not junk science, its lack of testing, widespread acceptance, and publication will almost certainly be the subject of cross-examination and countervailing expert testimony at trial and may cause a jury to reject CCIE as the cause of Brandon's injuries here. But that determination must be made by a jury, not a judge.

¶ 21 Our supreme court's opinion in *Ford* illustrates that the admission standard for expert testimony is liberal and depends on

the unique factual circumstances surrounding the testimony. In that case, a child was born with a brachial plexus injury (an injury to the nerves that originate from the spinal cord in the neck and control movement and sensation in the shoulder and arm). *Ford,* 250 P.3d at 264. The plaintiffs alleged that the doctor who performed the delivery caused the injury by applying too much force when applying traction on the child. *Id.* The defendant doctor's experts intended to testify that the child's injury was not caused by the doctor, but by "maternal intrauterine forces"; in other words, that "the internal forces of labor and delivery" caused the injury. *Id.* at 264-65.

¶ 22 The trial court held that the intrauterine forces theory was not scientifically reliable because there was no data available to establish its reliability. *Id.* at 265. The supreme court reversed, explaining that because the nature of the intrauterine forces theory made it impossible and unethical to test, the absence of testing and data was not a proper ground on which to find the theory unreliable. *Id.* at 268-69. The supreme court held that the theory was reasonably reliable based on the totality of the circumstances, which included the fact that other jurisdictions had admitted expert

testimony on the theory, a body of peer-reviewed literature existed challenging the previously accepted theory that applying traction is "the sole or primary cause of brachial plexus injuries" under similar circumstances, and the American College of Obstetrics and Gynecologists (ACOG) had "recognized" the intrauterine forces theory. *Id.*

¶ 23 As we understand *Ford,* the supreme court did not hold that ACOG's recognition of the intrauterine forces theory and the existence of a body of literature challenging a competing theory were prerequisites for admission of the intrauterine forces testimony. Instead, these were factors that, under the unique totality of the circumstances of the case, justified the acceptance of the intrauterine forces theory as scientifically reliable.

¶ 24 Although the facts of our case are similar to *Ford*, they are not completely analogous. Like *Ford,* there is no testing data for CCIE, and for similar reasons — causing CCIE would be unethical and therefore it is impossible to test. But unlike *Ford*, we are aware of no previously accepted theory explaining what causes injuries like Brandon's. The absence of a body of literature challenging that nonexistent orthodoxy is therefore irrelevant. We therefore see little

utility in a fact-by-fact comparison of our case to *Ford.* Instead, we conclude that, because the trial court exceeded the bounds of its gatekeeper function in evaluating the totality of the circumstances described above, the trial court's exclusion of the CCIE testimony was an abuse of discretion.

### C. Testimony Applying CCIE to Brandon's Case was Reasonably Reliable

¶ 25    Having concluded that CCIE testimony generally is reasonably reliable, we next turn to the question of whether plaintiffs' experts' testimony that CCIE was the cause of Brandon's ischemic injuries was reasonably reliable. We conclude it was.

¶ 26    At the hearing, Dr. Schifrin testified that he had thoroughly reviewed Brandon's medical records and used a differential diagnosis to arrive at the conclusion that CCIE caused his hypoxic ischemia. A differential diagnosis is a widely accepted diagnostic technique that identifies a cause of injury through a process of elimination — in other words, ruling out all but one possible cause. Dr. Schifrin testified in detail about why all the other potential causes of Brandon's hypoxic ischemia were implausible. He then explained that because CCIE fit as a cause of Brandon's hypoxic

ischemia, and no other causes were plausible, CCIE likely caused Brandon's injury. This testimony was uncontroverted — defendants' experts did not opine that there was an alternative cause of Brandon's injuries. We therefore conclude that this testimony was reasonably reliable as well.

### D. All CCIE Testimony was Relevant and Admissible under CRE 403

¶ 27 The district court determined that the CCIE testimony was not relevant because it was not helpful to the jury, and that it was inadmissible under CRE 403. We disagree with both rulings.

¶ 28 The district court concluded that the CCIE testimony was not helpful to the jury because it was not "scientifically valid or reasonably reliable" and "cannot be tied to the events of Brandon Trujillo's delivery." As explained above, the theory was sufficiently reliable to survive the court's gatekeeper inquiry. And plaintiffs' experts tied CCIE to Brandon's injuries through a differential diagnosis, a widely accepted diagnostic methodology for ascertaining diagnosis. Because the testimony was reliable and bore on causation, one of the central issues in the case, we conclude that it was helpful to the jury and therefore relevant.

14

¶ 29     We also disagree with the district court's ruling that the CCIE testimony was inadmissible under CRE 403 because "the CCIE theory did not exist" at the time of the events in question. The theory may not have had an official name or acronym. But, as explained above and as the trial court itself stated, the pathophysiological concepts on which CCIE is based (excessively long, powerful, and frequent contractions can threaten the health of a fetus by reducing the circulation of blood and oxygen in the fetus) are widely accepted. We therefore conclude that the probative value of the CCIE testimony was not substantially outweighed by any danger of unfair prejudice.

¶ 30     In sum, because the CCIE testimony was reasonably reliable, helpful to a jury, and admissible under CRE 403, the district court manifestly erred by excluding it. Based on this conclusion, we also reverse the district court's order granting defendants summary judgment. The court's sole basis for granting summary judgment was that all expert testimony about plaintiffs' single theory of causation — CCIE — was inadmissible. Because the CCIE testimony was admissible, plaintiffs had a causation theory sufficient to preclude summary judgment.

## III. Conclusion

¶ 31     The order granting defendants summary judgment is reversed and the case is remanded to the district court with directions to reinstate plaintiffs' claims and conduct further proceedings consistent with this opinion.

JUDGE ROMÁN and JUDGE TOW concur.