Opinions of the Colorado Supreme Court are available to the
public and can be accessed through the Judicial Branch's homepage at
http://www.courts.state.co.us. Opinions are also posted on the
Colorado Bar Association's homepage at http://www.cobar.org.

ADVANCE SHEET HEADNOTE
May 10, 2021

**2021 CO 28**

**No. 19SC556, *Lawrence v. People*—Criminal Justice—Securities Regulation—Theft—Expert Witness Testimony.**

In this prosecution for securities fraud and theft, the supreme court addresses (1) whether an agreement entered into by the defendant and the victim constitutes an investment contract and therefore a security for purposes of the Colorado Securities Act; (2) whether the trial court erred in admitting expert testimony of the Colorado Securities Commissioner opining generally on securities law and specifically that the agreement at issue was an investment contract and therefore a security; and (3) the proper remedy when the trial court incorrectly instructs the jury regarding the value of the property taken and that value was disputed at trial.

The court now concludes that an investment contract is a contract, transaction, or scheme whereby people invest their money in a common enterprise and are led to expect profits derived substantially from the entrepreneurial or

managerial efforts of others and that under this definition, the contract at issue was an investment contract and therefore a security.

The court further concludes that, although the issue is close, the Commissioner's testimony was admissible under C.R.E. 702 and 704 and the standards set forth in *People v. Rector*, 248 P.3d 1196, 1203 (Colo. 2011), and even if the admission of this testimony was erroneous, any error was harmless.

Finally, the court concludes that when the trial court erroneously instructs the jury as to the value of the property taken and the parties dispute the value at trial, the proper remedy is to remand the case with instructions that the prosecution may either elect to retry the theft charge in its entirety or to agree to the entry of judgment based on the lowest degree of theft supported by the jury's verdict.

Accordingly, the court affirms the judgment of the division below.

## The Supreme Court of the State of Colorado

2 East 14th Avenue • Denver, Colorado 80203

## 2021 CO 28

**Supreme Court Case No. 19SC556**
*Certiorari to the Colorado Court of Appeals*
Court of Appeals Case No. 16CA1145

**Petitioner:**

Shaun David Keller Lawrence,

v.

**Respondent:**

The People of the State of Colorado.

**Judgment Affirmed**
*en banc*
May 10, 2021

**Attorneys for Petitioner:**
Megan A. Ring, Public Defender
Jessica A. Pitts, Deputy Public Defender
      *Denver, Colorado*

**Attorneys for Respondent:**
Philip J. Weiser, Attorney General
Brittany L. Limes, Assistant Attorney General
      *Denver, Colorado*

**Attorneys for Amicus Curiae Tung Chang, Securities Commissioner for the State of Colorado:**
Philip J. Weiser, Attorney General
Robert W. Finke, First Assistant Attorney General
Jordanna L. Haskins, Senior Assistant Attorney General

Janna K. Fischer, Assistant Attorney General
    *Denver, Colorado*

**Attorneys for Amicus Curiae North American Securities Administrators Association, Inc.:**
Ballard Spahr LLP
Theodore J. Hartl
    *Denver, Colorado*

**JUSTICE GABRIEL** delivered the Opinion of the Court.

¶1     This prosecution for securities fraud and theft requires us to address three questions. First, we must decide whether the agreement entered into by defendant Shaun Lawrence and the victim, D.B., was an investment contract and therefore a security for purposes of the Colorado Securities Act (the "Act"), §§ 11-51-201(17), -501(1), C.R.S. (2020). Second, we must consider the limits of expert testimony offered by the Colorado Securities Commissioner in a case like this one. And third, we must decide the proper remedy when the trial court incorrectly instructs the jury regarding the value of the property taken and that value was disputed at trial.[1]

¶2     We now conclude first that an investment contract is a contract, transaction, or scheme whereby people invest their money in a common enterprise and are led

---

[1] Specifically, we granted certiorari to review the following issues:

1. Whether, in a securities fraud case where the key issue at trial is whether an investment is a security, an expert improperly testifies to the ultimate issue by opining on the law and applying the law to the facts to conclude that the investment was a security.

2. Whether an investment in a company, where the investor intends to be an active participant in decision-making and an employee of the company, is an "investment contract" subject to securities laws.

3. Whether Petitioner, who is entitled to the ameliorative benefit of the amendments to the theft statute, should be entitled to the entry of a conviction for the degree of theft supported by the jury's verdict, or whether he should be subjected to a new theft trial.

3

to expect profits derived substantially from the entrepreneurial or managerial efforts of others, on whose honesty and skill the investors have relied to manage their money. Applying this definition here, we conclude that the agreement at issue was an investment contract and therefore a security.

¶3 Next, we conclude that in assessing the proper scope of the expert testimony at issue under C.R.E. 702 and 704, we must consider, among other things, the four factors set forth in *People v. Rector*, 248 P.3d 1196, 1203 (Colo. 2011), namely, whether (1) the expert's testimony was clarified on cross-examination; (2) the expert expressed an opinion as to the applicable law or legal standards, thereby usurping the function of the court; (3) the jury was properly instructed on the law and that it may accept or reject the expert's opinion; and (4) the expert opined that the defendant committed the crime or that a particular likelihood existed that the defendant did so. Applying those factors here, although we perceive the issue to be close, we conclude that the Commissioner's testimony was admissible, and even if one could perceive error, any error by the trial court in admitting that testimony was harmless.

¶4 Finally, we conclude that when, as here, the trial court erroneously instructs the jury as to the value of the property taken and that value was disputed at trial, the proper remedy is to remand the case with instructions that the prosecution may elect to retry the theft charge as a whole or to agree to the entry of judgment

4

based on the lowest degree of theft supported by the jury's verdict (here, a class 1 misdemeanor).

¶5     Accordingly, we affirm the judgment of the division below.

## I. Facts and Procedural History

¶6     Lawrence met D.B. at a casino, where she worked as a cashier. During their conversations, Lawrence told D.B. that he ran several successful businesses and that he was looking for people to work for him and for investors to help grow a private investigations business called Advert Investigations ("Advert"). D.B. was interested and asked Lawrence if he was hiring and what the pay would be. Lawrence responded that the pay was anywhere from $18 to $22.50 per hour but that D.B. would have to complete three hundred hours of training without pay before she would be paid. The two then discussed a possible investment by D.B., including how much D.B. would be willing to invest and the interest in the company that she would receive.

¶7     Several weeks later, Lawrence and D.B. met again, and the two signed an "Investment and Business Agreement." This agreement provided that D.B. would invest $6,000 in exchange for a twenty percent ownership interest in Advert. The agreement further provided that Lawrence would (1) have an annual independent audit performed and provide the results to D.B.; (2) send to D.B week-end revenue reports; and (3) notify D.B. of any matter that might affect the business or its

revenue flow. And the agreement stated that Lawrence, D.B., and two others would have decision-making authority as to any matter concerning the business, subject to D.B.'s twenty percent voting power. Upon signing this agreement, Lawrence instructed D.B. to deposit her $6,000 investment into his personal bank account, and D.B. did so.

¶8 A little over three weeks later, Lawrence told D.B. that an investor had dropped out and that an additional ten percent ownership interest in the business had become available. Lawrence indicated that the cost for the additional share of the company would be $3,000, and D.B. agreed to invest that additional amount. The parties thus signed a second "Investment and Business Agreement." This agreement voided the prior agreement that the two had signed. In addition, the agreement provided that, in exchange for an additional equity investment of $3,000, D.B. would obtain a total ownership interest of thirty percent of the business. And the agreement contained the same disclosure and reporting terms as the prior agreement and substantially the same provision regarding decision-making authority (the only difference being that the language was changed to indicate D.B.'s thirty percent voting power). Again, Lawrence asked D.B. to deposit the investment amount in his personal bank account, and D.B. did so.

¶9　　Notably, at no time prior to D.B.'s investments did Lawrence tell her that he would use the money to pay for personal and gambling expenses. Nor did he ever advise her that he had outstanding civil judgments against him totaling over $100,000.

¶10　　At some point after the parties signed the second agreement, Lawrence showed D.B. two options for office space, D.B. selected one of them, and Lawrence rented that space and brought in some cameras and computers. In addition, Lawrence registered "Advert Investigations" with the Secretary of State and purchased a series of domain names for the business.

¶11　　During this early phase of the parties' business relationship, D.B. and Lawrence had occasional communications about the business. Lawrence even allowed D.B. to complete one service of process job. And D.B. visited the office several times. Thereafter, however, Lawrence stopped communicating with D.B., after which D.B. went to the office to see if she could find anything related to the business there. She found the office empty, except for some random paperwork on the desk, a filing cabinet, and a single dusty computer. As it turned out, Lawrence had withdrawn all of the money that D.B. had invested and spent it on gambling and personal expenses.

¶12　　In light of the foregoing, D.B. filed a complaint with the State Division of Securities, which subsequently referred the case to the district attorney's office for

prosecution. The People then charged Lawrence with (1) two counts of securities fraud under sections 11-51-501(1)(b) and 11-51-603(1), C.R.S. (2020) (one count was based on Lawrence's failure to disclose that he would use D.B.'s investment money for personal expenses, including gambling, and the other was based on Lawrence's failure to disclose the outstanding civil judgments against him), and (2) one count of theft under the version of the theft statute in effect at the time of the crimes at issue, which classified theft of $1,000 or more but less than $20,000 as a class 4 felony. § 18-4-401(2)(c), C.R.S. (2012). Notably, however, after Lawrence committed the alleged offenses but before his case got to trial, the legislature amended the theft statute to re-classify the levels of theft offenses. *See* § 18-4-401(2), C.R.S. (2020). Under the amended statute, a conviction for theft of $1,000 or more but less than $20,000 could, depending on the precise value of the thing taken, be classified as anywhere from a class 1 misdemeanor to a class 5 felony. § 18-4-401(2)(e)–(g).

¶13 Lawrence's case proceeded to trial, and at trial, the parties disputed, among other things, the extent of control that D.B. had exercised in connection with the business. In particular, the prosecution argued that D.B. had no experience running a business, that she was relying completely on Lawrence to do so, and that she had no authority to control Advert's business. Lawrence, in contrast, contended that D.B., in fact, had some ability to control the business, as evidenced

8

by her ownership interest, her role in deciding the office's location, the communications and disclosures that were required under the parties' agreement, and the fact that the agreement contained a provision regarding D.B.'s decision-making authority.

¶14 The parties also disagreed as to the extent of the alleged theft. The prosecution argued that Lawrence had stolen all $9,000 of D.B.'s investment, which he then used for personal and gambling expenses. Lawrence, in contrast, asserted that he had used at least some of the money for legitimate business purposes.

¶15 And, as pertinent to the issues now before us, the prosecution called Gerald Rome, then the Securities Commissioner for the Colorado Division of Securities, to testify as an expert witness. Among other things, Commissioner Rome testified regarding the general purposes of the securities laws, what qualifies as a security (including an investment contract), and the obligation of sellers of securities to provide investors with full and fair disclosures of all material facts. On this last point, Commissioner Rome explained to the jury the kinds of facts that would be material, including, for example, the background and personal affairs of the persons running the business (such as whether they had any tax liens or civil judgments pending against them). In addition, over Lawrence's objection, Commissioner Rome opined that the circumstances of the transaction at issue met

the definition of an investment contract because, among other things, the documents that the Commissioner had reviewed indicated that D.B was relying primarily on the managerial efforts of others. Accordingly, Commissioner Rome opined that the investment contract at issue was a security.

¶16 At the conclusion of the evidence, the trial court told the jury, among other things, that the court's instructions provided the rules of law that the jury was to apply to reach its verdicts. In addition, the court instructed the jury on the definitions of a security, an investment contract, and materiality. The court also told the jury that (1) it could believe all of the testimony of a witness, part of it, or none of it and (2) it was not bound by the testimony of expert witnesses but rather was to weigh such testimony as that of any other witness and could determine the weight to be given that testimony. And the court instructed the jury on the crime of theft pursuant to the 2012 version of the theft statute, which classified theft of $1,000 or more but less than $20,000 as a class 4 felony. § 18-4-401(2)(c), C.R.S. (2012).

¶17 The jury ultimately convicted Lawrence as charged, and Lawrence appealed. In his appeal, he contended, among other things, that (1) the evidence did not establish that the transaction at issue involved a security (namely, an investment contract); (2) Commissioner Rome's expert testimony usurped the jury's role as factfinder because the Commissioner was improperly permitted to

opine on the ultimate factual issues in this case; and (3) Lawrence was entitled to the ameliorative benefit of the amendments to the theft statute and, as a result, he could only stand convicted of a class 1 misdemeanor because that was the lowest degree of theft that the jury's verdict supported. *People v. Lawrence*, 2019 COA 84, ¶¶ 12, 30, 57, __ P.3d __.

¶18 In a unanimous, published opinion, a division of the court of appeals affirmed in part and reversed in part. *Id.* at ¶¶ 1–3, 63. As pertinent here, the division first concluded that the evidence was sufficient to establish that the transaction at issue involved an investment contract and thus a security. *Id.* at ¶¶ 13–19. The division further concluded that the trial court did not abuse its discretion in admitting Commissioner Rome's challenged testimony because (1) the trial court had properly instructed the jurors on the definition of a security; (2) the trial court had also properly instructed the jury that the instructions provided the law that the jurors were to apply and that the jurors did not have to accept any of an expert's testimony; (3) a trial court does not abuse its discretion by allowing an expert to provide general testimony as to what facts might be deemed material; and (4) Commissioner Rome had not usurped the jury's role because defense counsel had thoroughly explored on cross-examination the definition of a security and the concept of materiality and the Commissioner had

not opined on whether Lawrence committed any of the crimes charged. *Id.* at ¶¶ 30–35.

¶19 Finally, the division noted that the parties agreed that Lawrence's conviction for a class 4 felony could not stand because in *People v. Stellabotte*, 2018 CO 66, ¶ 3, 421 P.3d 174, 175, this court concluded that ameliorative, amendatory legislation applies retroactively to non-final convictions unless the amendment provides that it applies prospectively only. *Lawrence*, ¶ 54. The question thus became the appropriate remedy, and the division ultimately concluded that when a jury instruction misstates the elements necessary to convict a defendant of a crime but accurately states the elements of a lesser crime, the prosecution may elect to retry the defendant for the greater crime or agree to the entry of a conviction to the lesser crime. *Id.* at ¶¶ 57–61. The division thus remanded the case with instructions that the prosecution be permitted to make that choice. *Id.* at ¶ 62.

¶20 Lawrence then petitioned for a writ of certiorari, and we granted his petition.

## II. Analysis

¶21 We begin our analysis by addressing whether the agreement at issue was an investment contract and thus a security for purposes of the Act. After concluding that it was, we proceed to consider the proper scope of expert testimony from the Colorado Securities Commissioner in securities fraud cases like this one. Guided

12

by the factors set forth in *Rector*, 248 P.3d at 1203, we conclude that the admission of the expert testimony here was not reversible error. Finally, we address the appropriate remedy for the erroneous instruction regarding the value of the property taken for purposes of the theft charge in this case.

## A. Investment Contract

¶22 Lawrence first contends that his agreement with D.B. did not constitute an investment contract because D.B. actively participated in Advert's business and could control her investment. Lawrence thus asserts that D.B.'s investment was not a security and therefore his securities fraud convictions were not supported by sufficient evidence. We disagree.

¶23 We review the record de novo to determine whether the evidence presented at trial was sufficient in both quantity and quality to sustain a defendant's conviction. *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010). We consider "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt." *Id.* (quoting *People v. Bennett*, 515 P.2d 466, 469 (Colo. 1973)).

¶24 Section 11-51-501(1) of the Act provides, in pertinent part:

It is unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly:

13

. . . .

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they are made, not misleading.

¶25 Section 11-51-201(17), C.R.S. (2020), in turn, defines "security" to mean:

[A]ny note; stock; treasury stock; bond; debenture; evidence of indebtedness; certificate of interest or participation in any profit-sharing agreement; collateral-trust certificate; preorganization certificate of subscription; transferable share; investment contract; viatical settlement investment; voting-trust certificate; certificate of deposit for a security; certificate of interest or participation in an oil, gas, or mining title or lease or in payments out of production under such a title or lease; or, in general, any interest or instrument commonly known as a "security" or any certificate of interest or participation in, temporary or interim certificate for, guarantee of, or warrant or right to subscribe to or purchase any of the foregoing.

¶26 The Act does not define "investment contract," but we have long made clear that, insofar as the Act's provisions and purposes parallel those of the federal securities laws, federal authorities construing those federal laws are "highly persuasive." *Lowery v. Ford Hill Inv. Co.*, 556 P.2d 1201, 1204 (Colo. 1976).

¶27 As pertinent here, the Act and the federal Securities Act of 1933, 15 U.S.C. § 77b(a)(1) (2018), define "security" virtually identically. *Lowery*, 556 P.2d at 1204–05. Thus, we may look to federal authority for guidance.

¶28 In *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 298–99 (1946), the Supreme Court adopted a three-part test to determine whether a contract is an investment

14

contract. Under that test, an investment contract is defined as "[1] a contract, transaction or scheme whereby a person invests his money [2] in a common enterprise and [3] is led to expect profits solely from the efforts of the promoter or a third party." *Id.* This test was intended to embody "a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." *Id.* at 299.

¶29 Notably, case law from both federal and Colorado state courts have not construed the word "solely" in the third prong of the *Howey* test literally. *See Rome v. HEI Res., Inc.*, 2014 COA 160, ¶ 21, 411 P.3d 851, 856–57 (collecting cases). Thus, in *People v. Blair*, 579 P.2d 1133, 1141–42 (Colo. 1978), we agreed:

> The most essential consistency in the cases which have considered the meaning of the term "investment contract" is their emphasis on whether or not the investor has substantial power to affect the success of the enterprise. When the investor is relatively uninformed and then turns over his money to others, essentially depending upon their representations and their honesty and skill in managing it, the transaction is generally considered to be an investment contract.

(Quoting *S.E.C. v. Heritage Tr. Co.*, 402 F. Supp. 744, 749 (D. Ariz. 1975).)

¶30 Similarly, in *Rome*, a division of our court of appeals observed, "[T]he 'critical inquiry is . . . whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise.'" *Rome*, ¶ 21, 411 P.3d at 856 (quoting *Long v.*

15

*Schultz Cattle Co.*, 881 F.2d 129, 133 (5th Cir. 1989) (internal quotations omitted)). The division continued, "The dispositive inquiry is thus whether the investor was 'led to expect profits derived from the entrepreneurial or managerial efforts of others.'" *Id.*, 411 P.3d at 857 (quoting *Toothman v. Freeborn & Peters*, 80 P.3d 804, 811 (Colo. App. 2002)).

¶31 In light of the foregoing, we now clarify that an investment contract is a contract, transaction, or scheme whereby people invest their money in a common enterprise and are led to expect profits derived substantially from the entrepreneurial or managerial efforts of others, on whose honesty and skill the investors have relied to manage their money.

¶32 Turning then to the facts before us, we have little difficulty concluding that Lawrence's agreement with D.B. was an investment contract.

¶33 The parties do not dispute that they entered into an agreement whereby D.B. invested money in a common enterprise with Lawrence.

¶34 In addition, the record shows that D.B. was led to expect profits derived substantially from the entrepreneurial or managerial efforts of Lawrence and that she had relied on his honesty and skill to manage her money. Specifically, the record demonstrates that D.B. was looking to and relying almost completely on Lawrence to develop Advert and to make it a profitable business. Notwithstanding Lawrence's assertions to the contrary, D.B. had little to no

expertise in a security business like the one Lawrence was promoting. She performed essentially no work for Advert. Lawrence spent D.B.'s investment money without consulting her. And the record does not support a contention that D.B. had any actual ability to affect the success of the enterprise. At best, she was a trainee who gave Lawrence $9,000 of her money and looked to him to use it to build the business that Lawrence had promoted to her.

¶35 In so concluding, we are not persuaded by Lawrence's suggestions that (1) in deciding whether the parties entered into an investment contract, we must look to the investor's intent and (2) here, because the parties' agreement gave D.B. the right to view business records and promised more involvement in the future, the agreement was not an investment contract. Were these factors dispositive, promoters of a venture could essentially always avoid the applicable securities laws by simply including in their contracts provisions that give investors minimal opportunities to view business records and promise future involvement in the management of the proposed business opportunity. We decline to adopt such a view, which we believe would produce absurd results.

¶36 For these reasons, we conclude that Lawrence's agreement with D.B. constituted an investment contract and was therefore a security for purposes of the Act. Accordingly, we agree with the division below that sufficient evidence supported Lawrence's securities fraud convictions.

17

## B. Expert Testimony

¶37     Lawrence next contends that the trial court erred in allowing Commissioner Rome to testify to the ultimate issues of whether D.B.'s investment was a security and whether the facts that Lawrence failed to disclose to her were material. In Lawrence's view, the Commissioner's testimony usurped the functions of the court and the jury. Again, we are unpersuaded.

¶38     CRE 702 provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." The focus of a CRE 702 inquiry is on whether the proffered evidence is both reliable and relevant. *People v. Shreck*, 22 P.3d 68, 77 (Colo. 2001). In determining whether the expert testimony at issue is reliable, "a trial court should consider (1) whether the . . . principles as to which the witness is testifying are reasonably reliable, and (2) whether the witness is qualified to opine on such matters." *Id.* In deciding whether the evidence is relevant, the court should consider whether the testimony would be useful to the jury. *Id.* Expert testimony is useful if it "will assist the fact finder to either understand other evidence or to determine a fact in issue." *People v. Ramirez*, 155 P.3d 371, 379 (Colo. 2007).

¶39　CRE 704, in turn, provides, "Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."

¶40　In *Rector*, 248 P.3d at 1203, we set forth a number of factors that courts should consider in determining whether opinion testimony is admissible under CRE 704. These factors include, but are not limited to, whether (1) the testimony was clarified on cross-examination; (2) the expert's testimony expressed an opinion of the applicable law or legal standards and thereby usurped the function of the court; (3) the jury was properly instructed on the law and that it could accept or reject the expert's opinion; and (4) the expert opined that the defendant had committed the crime or that there was a particular likelihood that the defendant did so. *Id.*

¶41　Applying these principles, many divisions of our court of appeals have upheld the admission of expert testimony like that at issue here, including expert testimony from the current or former Colorado Securities Commissioner or Deputy Commissioner embracing ultimate questions of whether the transaction at issue involved a security or whether any misrepresentations or omissions were material. The sole qualifications set forth in those cases were that the ultimate questions be submitted to the jury and that the jury be instructed that it was to follow the law as instructed by the court and that it could reject the expert's

testimony in whole or in part. *See, e.g.*, *People v. Destro*, 215 P.3d 1147, 1152 (Colo. App. 2008) (concluding that the trial court did not err in allowing a former securities commissioner to offer expert testimony on whether a particular investment program constituted an investment contract because the jury retained the authority to determine the facts from the evidence and to accept or reject the expert's opinion, and because the expert offered no opinion regarding the defendant's guilt); *People v. Pahl*, 169 P.3d 169, 182 (Colo. App. 2006) (upholding the admission of the former securities commissioner's expert testimony that a joint operating agreement concerning an oil drilling project was a security because the issue was submitted to the jury and the jury was properly instructed); *People v. Prendergast*, 87 P.3d 175, 181–83 (Colo. App. 2003) (affirming the admission of the deputy security commissioner's expert testimony providing a brief overview of securities law and explaining the principles of full and fair disclosure and materiality because the testimony was substantively correct, the trial court properly instructed the jury, and the witness's special knowledge assisted the jury); *People v. Rivera*, 56 P.3d 1155, 1163–64 (Colo. App. 2002) (concluding that the securities commissioner's expert testimony regarding whether a limited partnership agreement constituted a security and whether certain information was material did not usurp the jury's factfinding function and was properly admitted because the testimony assisted the jury in understanding the evidence and the jury

20

retained the authority to determine the facts from the evidence and to accept or reject the expert's opinions).

¶42 In this case, and in *People v. Baker*, 2021 CO 29, __ P.3d __, which we also decide today, we are asked to explore the limits of such testimony.

¶43 As a preliminary matter, we reaffirm the long-settled principle that trial courts have an obligation to serve as gatekeepers regarding the propriety of expert testimony. *Trujillo v. Vail Clinic, Inc.*, 2020 COA 126, ¶ 13, 480 P.3d 721, 724 (noting trial courts' role as gatekeepers regarding the admissibility of expert testimony); *see also Murray v. Just in Case Bus. Lighthouse, LLC*, 2016 CO 47M, ¶ 40, 374 P.3d 443, 455 ("Trial court judges act as gatekeepers to ensure the reliability of evidence . . . ."). Thus, as noted above, our trial courts must ensure that expert testimony presented to the jury is both reliable and relevant. *Shreck*, 22 P.3d at 77.

¶44 In cases like this one, it seems that many prosecutors have reflexively designated a current or former securities commissioner (or a current or former deputy securities commissioner) as an expert and have elicited testimony as to, among other things, whether the transaction at issue involved a security and whether any misrepresentations or omissions were material. These prosecutors have done so notwithstanding admonitions from divisions of the court of appeals that such testimony could "cross the line from acceptable opinion to unacceptable interference with the court's or jury's role," thereby putting convictions in

21

jeopardy of reversal. *Pahl*, 169 P.3d at 182; *see also Prendergast*, 87 P.3d at 182 (noting that "[t]here can be a fine line between impermissible expert testimony about legal issues and permissible expert testimony about a standard of care or an expert's conclusion based upon mixed questions of facts and law").

¶45 To be sure, in some cases, such testimony may well be reliable and relevant, as, for example, when the matter at issue is particularly complex or a jury is asked to decide whether a novel form of transaction involves a security. *See, e.g., United States v. Offill*, 666 F.3d 168, 175 (4th Cir. 2011) (concluding that "the specialized nature of the legal regimes involved in [the case at issue] and the complex concepts involving securities registration, registration exemptions, and specific regulatory practices make it a typical case for allowing expert testimony that arguably states a legal conclusion in order to assist the jury"); *S.E.C. v. U.S. Env't, Inc.*, No. 94Civ.6608(PKL)(AJP), 2002 WL 31323832, at *2 (S.D.N.Y. Oct. 16, 2002) (noting that federal courts have admitted expert testimony under Fed. R. Evid. 702 in securities cases "to assist the trier of fact in understanding trading patterns, securities industry regulations, and complicated terms and concepts inherent in the practice of the securities industry"); *Destro*, 215 P.3d at 1152 (upholding the admission of a former securities commissioner's expert testimony as to whether an investment program in which a company was created to purchase real property

and profit from the practice of "flipping" that property constituted an investment contract).

¶46    In other cases, however, expert testimony of this nature may not be necessary and may not assist the jury. *See, e.g., Offill*, 666 F.3d at 175 (noting that it does not help the jury for an expert to give testimony that merely states legal standards or draws legal conclusions by applying the law at issue to the facts of the case); *United States v. Chapman*, 209 F. App'x 253, 269 (4th Cir. 2006) (concluding that the contract at issue outlined the nature of the defendant's fiduciary duties and that having an expert testify as to whether the defendant violated those duties "would not be particularly helpful to the jury"); *Karns v. Emerson Elec. Co.*, 817 F.2d 1452, 1459 (10th Cir. 1987) (noting that the expert testimony at issue was not helpful because it effectively did no more than tell the jury what result to reach on two of the elements of the plaintiff's case, but nonetheless concluding that the jury was unlikely to have been confused or misled by this testimony, particularly given that "the facts were of a sufficiently technical nature that expert testimony could be expected to assist the jury in deciding the case"); *Harvey v. THI of N.M. at Albuquerque Care Ctr. LLC*, No. 12-CV-727 MCA/RHS, 2014 WL 12796900, at *5 (D.N.M. Mar. 31, 2014) (excluding expert testimony as to the use and purpose of confidentiality clauses in settlement agreements on the ground that such testimony was unnecessary, given

that the signatories to the agreements at issue, at least two of whom were attorneys, would be able to explain the agreements' confidentiality clauses and what the signatories understood those clauses to mean); *People v. Lesslie*, 939 P.2d 443, 450 (Colo. App. 1996) (concluding that "expert testimony was not needed simply to describe or interpret" certain facts, particularly when the jury heard ample testimony from numerous witnesses as to such facts).

¶47 In such cases, expert testimony would serve no purpose other than to have an expert—and possibly one with impressive credentials—tell the jury what conclusions to reach. As the above-cited cases make clear, however, such testimony has generally been deemed inadmissible.

¶48 For these reasons, in future cases like this one, and upon a proper motion calling into question the scope of a proffered expert's testimony, we encourage trial judges to assess, on a case-by-case basis, whether such testimony would truly be helpful to the jury before allowing the jury to hear it. Moreover, parties should not assume that testimony like that at issue here will be deemed admissible based solely on conclusory assertions that securities fraud matters are complex. Jurors are frequently tasked with making factual determinations on matters of some complexity, and we have confidence that they would be able to do so in many securities matters as well.

¶49 Turning then to the facts now before us, and with the foregoing principles in mind, we believe that the admissibility of Commissioner Rome's testimony presents a close question. Nonetheless, for several reasons, we cannot say that the admission of this testimony constituted reversible error.

¶50 First, we perceive no abuse of discretion in the trial court's finding that Commissioner Rome's testimony was reliable and relevant, as we have defined those terms for purposes of CRE 702. *See Shreck*, 22 P.3d at 77. The parties do not appear to dispute that Commissioner Rome's general testimony as to securities law principles was correct or that he was qualified to opine on such matters. *Id.* Nor do the parties appear to dispute that the Commissioner's testimony assisted the jury in understanding the evidence or determining facts in issue. *Id.*

¶51 Second, on the facts presented here, we do not believe that Commissioner Rome's testimony violated CRE 704 or improperly usurped the jury's role, even to the extent that the Commissioner opined that the transaction at issue was an investment contract and therefore a security and testified as to principles of materiality. As noted above, we assess the admissibility of testimony under CRE 704 pursuant to the factors set forth in *Rector*, 248 P.3d at 1203. Applying those factors here, we note that Commissioner Rome's testimony was clarified in defense counsel's cross-examination, which addressed, among other things, the definition of an investment contract; the meaning of materiality; the limited facts

on which the Commissioner had based his opinions (e.g., that he did not interview either Lawrence or D.B. and that he had no knowledge of D.B.'s background and experience in business or in the surveillance industry); and the Commissioner's potential bias, given that his office had initially investigated D.B.'s complaint and then referred the matter to the district attorney for prosecution.

¶52 In addition, Commissioner Rome never expressed an opinion of the applicable law or legal standards. Rather, he simply provided a general overview of the applicable law and offered examples to help explain the concepts.

¶53 The trial court also advised the jury that the instructions the court was providing contained the rules of law that the jury was to apply to reach its verdicts. The court further provided definitions of a security, an investment contract, and materiality. And the court told the jury that it could believe all of the testimony of a witness, part of it, or none of it, and that the jury was not bound by the testimony of expert witnesses but rather was to weigh such testimony as that of any other witness and could determine the weight to be given that testimony.

¶54 And lastly, Commissioner Rome did not opine that Lawrence committed any crime or that there was a particular likelihood that he did so. This is true even though he testified that the agreement at issue was an investment contract and therefore a security, and even though he discussed the principle of materiality. As to the first point, although Commissioner Rome indisputably provided an opinion

26

as to one element of the securities fraud charges, those charges were presented, in full, to the jury for its determination, and the jury was expressly instructed that it was free to disregard all of Commissioner Rome's testimony. As to the second point, Commissioner Rome did not express an opinion that the omissions in this case were material. Indeed, the trial court precluded him from offering such an opinion. Instead, he simply expounded on the general principle of materiality, and he provided hypothetical examples of the types of misrepresentations or omissions that might be material.

¶55 For these reasons, we conclude that Commissioner Rome's testimony did not violate CRE 704 or usurp either the court's or the jury's role.

¶56 Even if one could say, however, that the trial court may have abused its discretion in allowing Commissioner Rome to testify that the agreement at issue was an investment contract and to explain the concept of materiality, on the facts presented here, we would conclude that any such error was harmless. Substantial, if not overwhelming, evidence supported the jury's findings that the transaction involved an investment contract and therefore a security, and that Lawrence's omissions were material. Moreover, in his briefs before us, Lawrence's argument as to prejudice principally boiled down to a claim that Commissioner Rome's testimony was cumulative of other testimony and thus unnecessary. Even if true, the mere fact of such cumulative testimony does not persuade us that any error in

27

admitting that testimony affected Lawrence's substantial rights. *See Hagos v. People*, 2012 CO 63, ¶ 12, 288 P.3d 116, 119 (noting that under the harmless error standard, reversal is required only if the error affected the substantial rights of the parties); Crim. P. 52(a) (same).

¶57 Accordingly, even if the admission of Commissioner Rome's testimony could be said to have been erroneous, we would conclude that any such error was harmless and thus not reversible error. *See Hagos*, ¶ 12, 288 P.3d at 119; Crim. P. 52(a).

## C. Remedy

¶58 Finally, as noted above, although the parties agree that under *Stellabotte*, ¶ 3, 421 P.3d at 175–76, Lawrence is entitled to the ameliorative benefit of the amendments to the theft statute and that his class 4 felony theft conviction cannot stand, they disagree as to the proper remedy. Lawrence contends that he can only stand convicted of a class 1 misdemeanor because, in his view, that is the only degree of theft undeniably supported by the jury's verdict. The People, in contrast, contend that because, under the amended theft statute, the jury's verdict could support convictions ranging from a class 1 misdemeanor to a class 5 felony, the People can either elect to have the court on remand enter a conviction for the class 1 misdemeanor or proceed to a retrial limited to a determination of the

28

amount of money improperly taken from D.B. Like the division below, we do not agree with either approach.

¶59 We review the propriety of an appellate remedy de novo. *See Core-Mark Midcontinent Inc. v. Sonitrol Corp.*, 2016 COA 22, ¶ 29, 370 P.3d 353, 359 (observing that a question regarding the scope of a remand order presents an issue that the appellate court reviews de novo); *see also People v. Struckmeyer*, 2020 CO 76, ¶ 3, 474 P.3d 57, 58 (noting that we review questions of law de novo).

¶60 In *Stellabotte*, ¶ 3, 421 P.3d at 175–76, we concluded that ameliorative, amendatory legislation applies retroactively to non-final convictions for theft unless the amendment contains language indicating that it applies only prospectively. We further concluded that because the defendant committed the thefts at issue before the amendment to the theft statute but was convicted and sentenced thereafter, he was entitled to be resentenced in accordance with the amended statute. *Id.* at ¶ 36, 421 P.3d at 181.

¶61 Here, when Lawrence committed the theft for which he was ultimately convicted, the theft statute made it a class 4 felony to steal something valued at $1,000 or more but less than $20,000. § 18-4-401(2)(c), C.R.S. (2012). By the time of his trial, however, the legislature had amended the theft statute such that theft was a class 1 misdemeanor if the value of the thing involved was $750 or more but less than $2,000; a class 6 felony if the value was $2,000 or more but less than $5,000;

29

and a class 5 felony if the value was $5,000 or more but less than $20,000. § 18-4-401(2)(e)–(g). Accordingly, depending on the evidence, the jury's verdict in this case could have supported convictions for either a class 1 misdemeanor, a class 6 felony, or a class 5 felony. *Id.* The question thus becomes the proper remedy.

¶62 As the division correctly recognized, *Stellabotte* did not have to provide an answer to this question. We must do so now, however, because here, unlike in that case, the value of the amount stolen is disputed, with the People contending that Lawrence stole the entirety of D.B.'s $9,000 and Lawrence asserting that at least some of that money was used for legitimate business purposes.

¶63 On these facts, we are not persuaded by Lawrence's contention that he is entitled on remand to the entry of a judgment of conviction for a class 1 misdemeanor. Although it is true that the only theft amount that we know for certain that the jury found is the minimum charged value of $1,000, we perceive no basis for ignoring the fact that the jury's verdict might also have reflected a finding of a theft of up to $9,000.

¶64 We, however, are also unpersuaded by the People's assertion that they are entitled either to accept the entry of judgment for a class 1 misdemeanor or to conduct a new trial limited only to the amount of money improperly taken from D.B. (as opposed to a new trial on the theft count as a whole). In criminal cases, a

defendant's constitutional right to a trial by jury allows a conviction only on a verdict finding the defendant guilty of having committed every element of the crime charged. *People v. Oliver*, 2018 COA 146, ¶ 17, 452 P.3d 112, 115. In theft cases, the value of the property at issue is part of the offense charged, and the prosecution must prove that value beyond a reasonable doubt. *People v. Simpson*, 2012 COA 156, ¶ 20, 292 P.3d 1153, 1156; *accord People v. Tafoya*, 2019 CO 13, ¶ 28, 434 P.3d 1193, 1197. Accordingly, notwithstanding the People's contention to the contrary, we perceive no basis for allowing a retrial on only one component of the charged offense, and the People cite no applicable authority to suggest otherwise. As a result, if the People wish to try Lawrence again on the theft charge, then they must try the entire charge, not just the portion of the charge relating to the value of the money taken.

¶65 To conclude otherwise would violate Lawrence's right to a jury trial and would present a litany of other constitutional and practical problems. For example, would the jury be instructed that Lawrence has already been convicted? Such an instruction would arguably violate Lawrence's constitutional presumption of innocence. And what would happen if the jury considered only the value question and found that $0 was taken? Lawrence's conviction for theft, which presumably had already been decided, assuredly could not then stand. But the merits of the conviction would not be before the court.

¶66 We therefore conclude that on remand, the People may either elect to retry Lawrence on the felony theft claim or agree to the entry of a conviction for a class 1 misdemeanor theft.

## III. Conclusion

¶67 For the foregoing reasons, we conclude that Lawrence's agreement with D.B. constituted an investment contract and therefore sufficient evidence supported Lawrence's securities fraud convictions. We further conclude that the admission of Commissioner Rome's expert testimony did not constitute reversible error. And we conclude that on remand, the People may elect either to retry Lawrence on the theft charge as a whole or to agree to the entry of a conviction for a class 1 misdemeanor theft.

¶68 Accordingly, we affirm the judgment of the division below.