22CA0502 Peo v Barber 09-19-2024

COLORADO COURT OF APPEALS

---

Court of Appeals No. 22CA0502
City and County of Denver District Court No. 19CR8720
Honorable Eric M. Johnson, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Gene J. Barber,

Defendant-Appellant.

---

JUDGMENT AFFIRMED IN PART, REVERSED IN PART,
VACATED IN PART, AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE GOMEZ
Dunn and Navarro, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced September 19, 2024

---

Philip J. Weiser, Attorney General, Austin R. Johnston, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, River B. Sedaka, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1 Defendant, Gene J. Barber, appeals the judgment of conviction and the sentences entered on jury verdicts finding him guilty of two counts of sexual exploitation of a child and a court ruling finding him a habitual sex offender. We affirm in part, reverse in part, and vacate in part, and remand the case with directions.

## I. Background

¶ 2 The counts derived from an investigation that started in 2018, when the Federal Bureau of Investigation (FBI) and the Denver Police received alerts from Google that possibly sexually exploitative images were being uploaded to a Google Drive account. The FBI served an administrative subpoena on Google and received subscriber information, including a phone number and email addresses associated with the account, as well as the images saved in the account.

¶ 3 From that information, the FBI identified a motel address where Barber was staying and obtained a search warrant. Working together, the FBI and the Denver Police executed a search of Barber's motel room. During that search, they seized a cell phone on which more possibly sexually exploitative images were found, along with an image of Barber's Colorado identification card.

Another phone seized in that search — which Barber admitted was his — had bookmarks for websites known for having child pornography.

¶ 4 The prosecution charged Barber with the two counts of sexual exploitation of a child — count 1 for the images found in the Google Drive account and count 2 for the images found on the cell phone. It also charged Barber as a habitual sex offender against children based on a prior conviction in North Carolina.

¶ 5 At trial, Barber's theory of defense as to count 1 was that the Google Drive account on which the images were found wasn't his. His theory of defense as to count 2 was that the images from the cell phone were not sexually exploitative and the phone didn't belong to him. The jury convicted him on both counts. It also found, as to count 1, that Barber possessed more than twenty different items qualifying as sexually exploitative material, increasing the level of that offense from a class 5 to a class 4 felony. *See* § 18-6-403(5)(b)(II), C.R.S. 2018.[1]

---

[1] The statute has since been amended, but we apply the statute in effect at time of the offense.

¶ 6　　The court then held a hearing on the habitual offender count, after which it found the prosecution had satisfied its burden of proof. The court accordingly sentenced Barber to three times the presumptive maximum sentence for each of his sexual exploitation of a child convictions — eighteen years on count 1 and nine years on count 2 — with the sentences running concurrently.

¶ 7　　In this direct appeal, Barber alleges the following errors: (1) the trial court admitted improper hearsay evidence; (2) the trial court admitted other acts evidence in violation of CRE 404(b); (3) the prosecutor engaged in misconduct in closing argument; (4) the trial court admitted improper expert opinion testimony; (5) the cumulative effect of these errors requires reversal; (6) his enhanced sentences under the habitual sex offender statute violate his Sixth Amendment rights; (7) the evidence is insufficient to support his enhanced sentences under the habitual sex offender statute; and (8) his two convictions must merge.

¶ 8　　We agree that the court committed the first alleged error and conclude that it requires reversal as to count 1 but not count 2; we reject the second through fifth alleged errors; we agree with the sixth alleged error; and we decline to address the seventh and

eighth alleged errors as moot. Accordingly, we reverse the conviction on count 1, affirm the conviction but vacate the sentence on count 2, and remand the case for a new trial on count 1 and for resentencing on count 2.

## II. Hearsay

¶ 9 Barber first contends that the trial court erred by admitting improper hearsay evidence regarding the Google Drive account. We agree.

### A. Standard of Review and Applicable Law

¶ 10 We review a trial court's evidentiary rulings for an abuse of discretion. *People v. Abad*, 2021 COA 6, ¶ 8. A court abuses its discretion when its ruling is manifestly arbitrary, unreasonable, or unfair or when it misapplies the law. *People v. Vanderpauye*, 2023 CO 42, ¶ 23. However, to the extent that the trial court's evidentiary ruling is based on a determination of whether a statement constitutes hearsay, that is a legal conclusion, which we review de novo. *See People v. Hamilton*, 2019 COA 101, ¶ 12.

¶ 11 Hearsay is an out-of-court statement "offered in evidence to prove the truth of the matter asserted." CRE 801(c). Hearsay is inadmissible unless otherwise provided by applicable statutes or

rules. CRE 802; *Abad*, ¶ 52. Our rules of evidence recognize exceptions that allow admission of hearsay for certain inherently reliable out-of-court statements, such as business records that meet certain criteria. *People v. N.T.B.*, 2019 COA 150, ¶ 24; *see also* CRE 803. Where evidence contains multiple layers of possible hearsay, the trial court must analyze each layer separately to determine whether any hearsay exceptions apply. *People v. Phillips*, 2012 COA 176, ¶ 101; *see also* CRE 805.

¶ 12    If we determine that the trial court erred in ruling on a preserved evidentiary objection of nonconstitutional dimension, we assess whether that error requires reversal under the harmless error standard. *Hamilton*, ¶ 13. Under this standard, the People must prove that "the error did not substantially influence the verdict or affect the fairness of the trial proceedings." *James v. People*, 2018 CO 72, ¶ 19.

### B.    Additional Facts

¶ 13    Before trial, the prosecution filed a notice under CRE 902(11) regarding its plan to introduce materials received from Google. The notice stated, in relevant part,

[Google] provided materials to investigators in this matter pursuant to search warrant. Included with the materials was a Certificate of Authenticity.

The Certificate of Authenticity was electronically signed by a [Google] records custodian who attested to actual knowledge of the manner in which records are stored by the company. The custodian verified that the produced compilation of materials sent responsive to the [s]earch [w]arrant were automatically made at or near the time of entry as a regular practice of business. The custodian indicated the resulting compilations were made in the regular course of business.

The Certificate of Authenticity was signed under the penalty of perjury.

The Certificate of Authenticity was included in initial discovery in this matter.

Pursuant to CRE 902(11) and CRE 803(6), the People indicate their intent to present the Certificate of Authenticity as foundation for admission of the underlying records.

¶ 14    While the certificate of authenticity was apparently provided in discovery, it was never presented to the trial court. Nor were the Google records themselves ever admitted into evidence at trial.

¶ 15    However, the prosecution elicited two kinds of evidence about the Google records through the testimony of FBI Special Agent Gerard Ackerman. Barber now challenges both kinds.

¶ 16    First, Ackerman testified about some of the specific information he received from Google.  The prosecutor initially asked Ackerman about the email account associated with the information he'd received from Google.  Defense counsel objected on hearsay grounds.  The court overruled the objection, acknowledging that "we're getting into hearsay" but ruling that "this is subject to 803(6) and 902(11)."  Ackerman went on to testify about various information he received from Google, including email addresses linked to the Google Drive account — which all appeared to be variations of Barber's name, like "barbergen," "gwenbarber," or "genebarber" — as well as a linked address and phone numbers that were associated with Barber.

¶ 17    Second, Ackerman testified about his review of the Google records with Forensic Toolkit (FTK) software.  Ackerman explained that he imported the records into FTK and then used the program to review and analyze them.  Through Ackerman's testimony, the prosecution introduced, over defense counsel's objection, Exhibits 1, 2, and 4 through 36, which were screenshots Ackerman had generated using FTK.  The screenshots displayed blacked-out images from Google Drive with notations displaying information like

the file name, file size, file location, and date a file was last modified. For example, the notation on Exhibit 4 showed that the image file was stored on a Google Drive account with the username "barbergen8" and was modified on September 19, 2018.

### C. Analysis

#### 1. The Google Records

¶ 18 We first address an issue underlying both kinds of evidence the prosecution presented regarding the Google records — the admissibility of the records themselves.

¶ 19 The parties agree, as do we, that the Google records are hearsay. They consist of out-of-court statements presented for the truth of the matter asserted — in particular, that the images came from a Google Drive account that was linked with specific usernames, email addresses, and telephone numbers and a specific address and that the images in that account were modified at a specific time. *See* CRE 801(c).

¶ 20 The parties disagree, however, whether the Google records fall into the hearsay exception for business records. This exception applies to a "record . . . , in any form, of acts, events, conditions, opinions, or diagnosis, made at or near the time by, or from

8

information transmitted by, a person with knowledge" so long as the record is "kept in the course of a regularly conducted business activity" and "it was the regular practice of that business activity to make the . . . record." CRE 803(6). These requirements may be established through "the testimony of the custodian or other qualified witness, or by certification that complies with Rule 902(11), Rule 902(12), or a statute permitting certification." *Id.*

¶ 21 The People rely solely on Rule 902(11) to establish the application of the business record hearsay exception, as no witness testified about how Google's records were maintained and no one argues that any other method provided in Rule 803(6) applies.

¶ 22 Rule 902(11) requires "an affidavit of [a] custodian or other qualified person, in a manner complying with any Colorado statute or rule prescribed by the Colorado Supreme Court," certifying that a record satisfies the requirements of the business records exception. *See People v. Quillen*, 2023 COA 22M, ¶ 18; *People v. Glover*, 2015 COA 16, ¶ 15.

¶ 23 The prosecution didn't present any such affidavit to the trial court (nor is one in the record). Without an affidavit, or the testimony of a custodian, or some other means to establish

application of the business records exception, that exception simply cannot and does not apply. *See* CRE 803(6); CRE 902(11); *see also N.T.B.*, ¶ 42 (Dropbox and Comcast records contained inadmissible hearsay that couldn't be admitted "without testimony from the records custodians or an affidavit"). Thus, the Google records remained inadmissible hearsay evidence that didn't fall into any hearsay exception. Although the prosecution provided notice of its intention to offer such an affidavit, as required by Rule 902(11), it still needed to provide the affidavit itself to support admission of the records.

¶ 24 We reject the People's argument that Barber didn't preserve any objection based on the missing certificate of authenticity. Defense counsel lodged multiple hearsay objections, including when the prosecution initially began eliciting testimony about the Google records. That was sufficient to alert the court to Barber's position that the records didn't fall within the business records exception; and the court seemed to understand that, as it cited Rules 803(6) and 902(11) in overruling the initial objection. *See People v. Terhorst*, 2015 COA 110, ¶ 12 (an objection that sufficiently alerts a trial court to a particular issue to correct any error preserves the

issue for appellate review; and acquiescence in the court's ruling "is not akin to a waiver, but instead permits the party adversely affected by the ruling to seek appellate relief"). And it was the burden of the prosecution, as the proponent of the evidence, to establish application of a hearsay exception. *See Vanderpauye*, ¶ 25.

¶ 25      While we recognize that the Google records weren't themselves admitted at trial, those records underlay both Ackerman's testimony about the record contents and Ackerman's screenshots from the FTK program. We turn to those matters next.

2.      Testimony About the Contents of the Google Records

¶ 26      We agree with Barber's contention that the trial court erred by admitting Ackerman's testimony about the Google records. As Barber points out, this testimony constituted double hearsay, inadmissible for two separate reasons.

¶ 27      First, as we've explained, the Google records themselves were inadmissible hearsay because the prosecution didn't establish that they fell within the Rule 803(6) business records exception to the hearsay rule.

¶ 28     Second, Ackerman's testimony about the Google records added a second layer of hearsay that didn't fall within any exception.  As we've noted, the Google records were never admitted at trial.  Yet "[t]estimony about the contents of a . . . business record is admissible only when the record itself is introduced; otherwise, the witness's testimony is inadmissible hearsay." *People v. Vigil*, 2024 COA 72, ¶ 33.  In other words, the hearsay rule precludes witnesses from testifying about purported business records — like the Google records in this case — that aren't themselves admitted into evidence.  *See id.* at ¶ 34 (a trial court erred by admitting testimony about information in a letter that wasn't admitted into evidence); *Hamilton*, ¶ 30 (a trial court erred by admitting testimony about reports that weren't admitted into evidence).

¶ 29     For both reasons, the trial court erred by admitting Ackerman's testimony regarding the contents of the Google records.

### 3.     FTK Screenshots of the Google Records

¶ 30     We also agree with Barber's contention that the trial court erred by admitting screenshots of the Google records (Exhibits 1, 2, and 4 through 36) generated by the FTK software program.

12

¶ 31    To be sure, we agree with the People's argument that it was within the trial court's discretion to conclude that the FTK screenshots didn't add a second layer of hearsay, as Ackerman's testimony supports a conclusion that the information represented in the screenshots was generated by a computer without human intervention. *See Abad*, ¶¶ 54-56 (information that is purely computer generated isn't hearsay); *Hamilton*, ¶ 24 (same).

¶ 32    But the first layer of hearsay — the Google records — still remained. Because the FTK screenshots were based on the Google records, and those underlying records were inadmissible hearsay, the FTK screenshots were likewise inadmissible hearsay. Accordingly, we conclude that the trial court erred by admitting the screenshot exhibits as well.

### 4.    Harmlessness

¶ 33    Having determined that the trial court erred by admitting Ackerman's testimony and exhibits related to the Google records, we must consider whether the People have shown that the error was harmless. We conclude that they haven't.

¶ 34    The subscriber and location information from the Google records was the primary evidence linking the Google Drive account

to Barber.  While there was other evidence suggesting that those sexually exploitative materials belonged to Barber, such as the supposed blurry selfie of Barber, the evidence is far from overwhelming as the People assert.

¶ 35     Additionally, the notations on the screenshots included modification dates from the Google records.  It was through these dates that the prosecution aimed to prove that Barber possessed the sexually exploitative materials during the charged period.

¶ 36     Notably, the prosecution relied on both the subscriber information and the modification dates in closing argument.

¶ 37     Therefore, we can't say that the error in admitting the hearsay evidence didn't substantially influence the jury's guilty verdict on count 1.  *See James*, ¶ 19; *see also People v. Cohen*, 2019 COA 38, ¶ 37 (reversing the judgment where there was "a reasonable possibility that . . . inadmissible evidence influenced the jury's guilty verdicts").  We therefore reverse Barber's conviction on count 1 and remand the case for a new trial on that count.

¶ 38     We conclude, however, that the error does not require reversal of the conviction on count 2.  Ackerman's testimony and screenshot exhibits pertained only to count 1, regarding the Google Drive

14

images, whereas count 2 was based on separate images found on a phone in Barber's motel room. We aren't persuaded by Barber's assertion that the hearsay error infected both counts merely because the prosecutor told the jury to consider the Google Drive and cell phone evidence together. The trial court instructed the jury to consider the evidence for each count separately, and we presume that the jury followed that instruction. *See People v. Garcia*, 2012 COA 79, ¶ 20.

¶ 39     Therefore, we consider Barber's remaining contentions only as they relate to his conviction on count 2. But we don't address whether Barber's convictions on counts 1 and 2 should merge, as that issue is mooted by our reversal of the conviction on count 1.

## III.    Other Acts Evidence

¶ 40     Barber also contends that the trial court erred by (1) admitting other acts evidence in violation of Rule 404(b) and (2) failing to give a limiting instruction regarding that evidence. We disagree.

### A.    Standard of Review and Applicable Law

¶ 41     Again, we review a trial court's evidentiary rulings for an abuse of discretion. *Abad,* ¶ 8.

15

¶ 42     If evidence is probative of a material fact, then it is relevant and is presumptively admissible unless its probative value is substantially outweighed by other concerns, like a danger of unfair prejudice.  *Rojas v. People*, 2022 CO 8, ¶ 3; *see also* CRE 401-403.

¶ 43     Under Rule 404(a), evidence of a defendant's character trait is generally not admissible to prove that the defendant acted in conformity with that trait on a particular occasion.  But under Rule 404(b) and *People v. Spoto*, 795 P.2d 1314, 1318 (Colo. 1990), evidence of other acts is admissible if (1) it relates to a material fact; (2) it is logically relevant; (3) its logical relevance is independent of the prohibited intermediate inference that the defendant has a bad character and committed the crime charged in conformity with that bad character; and (4) its probative value is not substantially outweighed by the danger of unfair prejudice.  *See also People v. Vasquez*, 2022 COA 100, ¶ 75.

¶ 44     To determine whether evidence of uncharged misconduct triggers Rule 404(b) and the four-factor *Spoto* analysis, a trial court must first consider whether the evidence is intrinsic or extrinsic to the charged offense.  *Rojas*, ¶ 52.  If the evidence is intrinsic, meaning that it directly proves the charged offense or it occurred

contemporaneously with and facilitated the commission of the offense, then it may be admitted under general relevance principles. *Id.* But if the evidence doesn't meet these criteria, then it is extrinsic, and its admission is governed by Rule 404(b) and the *Spoto* analysis. *Id.*; *see also Spoto*, 795 P.2d at 1318.

### B. Admission of Evidence

¶ 45    We first reject Barber's contention that the trial court erred by admitting other acts evidence.

¶ 46    At trial, the prosecutor asked Ackerman about an unrecorded interview he and another FBI agent had had with Barber.

> Q.    Do you recall what you asked [Barber] about, if he viewed pornography?
>
> A.    Yes.  We asked, and I asked specifically if he viewed pornography.  He answered, yes, but he wasn't really into it anymore.
>
> Q.    Did you ever ask him what types of pornography he viewed?
>
> A.    Yes.
>
> Q.    And what was his answer to that?
>
> A.    Said he viewed regular pornography, meaning adult pornography.  *Also, he may have viewed child pornography in the past, and — but is no longer interested.*

(Emphasis added.) Defense counsel lodged an objection on CRE 403 and CRE 404 grounds, which the trial court overruled.

¶ 47 Later that day, the parties and the court further discussed the objection. Defense counsel asserted that the testimony that Barber had admitted to viewing child pornography "in the past" was inadmissible other acts evidence under Rule 404(b). However, the prosecution asserted that the reference to "the past" could include the charged period, which preceded the interview. (The interview took place in January 2019, while the charged period for count 1 ran from October to November of the prior year.) Defense counsel countered that such an interpretation wasn't reasonable because it was inconsistent with Barber's theory of defense that the materials in the Google Drive account weren't his.

¶ 48 Ultimately, the court concluded that the prosecution's interpretation was reasonable and, thus, that the statement could be interpreted to not constitute "other acts" and not trigger Rule 404(b). The court therefore maintained its original decision overruling the objection.

¶ 49 We agree with the trial court that Barber's reference to his conduct "in the past" is ambiguous. Both parties' interpretations

are reasonable and, thus, the statement isn't clearly intrinsic or extrinsic evidence. It was therefore reasonable for the prosecution to treat the statement as intrinsic evidence of guilt, not subject to Rule 404(b), even if the defense wanted to argue to the jury that its interpretation of the alleged statement was the correct one. We therefore conclude that the trial court did not abuse its discretion by concluding that the evidence didn't trigger Rule 404(b).

### C.     Limiting Instruction

¶ 50     We also reject Barber's alternative contention that even if the statement was admissible, the trial court erred by failing to give the jury a limiting instruction on it.

¶ 51     Defense counsel didn't request a limiting instruction when the statement was initially introduced. Barber points instead to his counsel's remarks when a juror submitted a question at the end of Ackerman's testimony asking, "If criminal activity is admitted, it occurred in the past. How relevant is it, and can it be considered?"

¶ 52     The court sought the parties' positions on posing the question to Ackerman. The prosecutor objected, saying it was "more of a legal question than a factual question for this witness." Defense counsel agreed: "I think it's probably a question for the judge, that

the jury's asking if they can consider testimony that [the] [d]efense objected to of the prior viewing.  I certainly don't think this witness can answer it."[2]  The court indicated its agreement, said it wouldn't ask that question, and moved on.  Neither side followed up at any point by asking the court to provide a limiting instruction or any other legal instruction to the jury on the issue.

¶ 53    Barber now asserts that this question shows that at least one of the jurors viewed the statement as extrinsic evidence and that, without a limiting instruction, the trial court allowed the jury to consider the statement for impermissible propensity purposes.

¶ 54    Because defense counsel didn't request a limiting instruction or any further action at trial, our review is for plain error.  *See People v. Clark*, 2015 COA 44, ¶ 123.  Under this standard, we will reverse only if any error was obvious and substantial and "undermined the fundamental fairness of the trial so as to cast serious doubt on the reliability of the judgment of conviction."  *Id.* (quoting *People v. Griffin*, 224 P.3d 292, 298 (Colo. App. 2009)).

---

[2] We disagree with Barber's suggestion that this statement in effect requested that the trial court provide a limiting instruction or otherwise answer the juror's question itself.

¶ 55    We discern no plain error.  "Absent a statutory requirement, a trial court is under no obligation to issue a limiting instruction sua sponte."  *Id.* at ¶ 134.  Thus, "divisions of this court have held that a trial court's failure to give a limiting instruction sua sponte in the CRE 404(b) context is not reversible plain error."  *People v. Bondsteel*, 2015 COA 165, ¶ 87, *aff'd on other grounds*, 2019 CO 26, *and overruled on other grounds by Garcia v. People*, 2022 CO 6; *see also Clark*, ¶¶ 135-136.  Moreover, in this case, giving a limiting instruction would've been inconsistent with the trial court's ruling — which we affirm — that the evidence wasn't subject to Rule 404(b).

## IV.    Prosecutorial Misconduct

¶ 56    Barber next contends that the trial court reversibly erred by allowing the prosecutor to make misstatements of evidence and law during closing argument.  We aren't persuaded.

### A.    Standard of Review and Applicable Law

¶ 57    We engage in a two-step analysis when we review a claim of prosecutorial misconduct.  *People v. Herold*, 2024 COA 53, ¶ 67.  First, we consider "whether the prosecutor's questionable conduct was improper based on the totality of the circumstances,"

21

and then we consider "whether such actions warrant reversal according to the proper standard of review." *Wend v. People*, 235 P.3d 1089, 1096 (Colo. 2010).

¶ 58     Where defense counsel lodged a contemporaneous objection at trial and the issue is not one of constitutional magnitude, we review the trial court's ruling on the alleged misconduct for an abuse of discretion and, if there is such an abuse of discretion, for harmless error. *People v. Lovato*, 2014 COA 113, ¶ 57.

¶ 59     However, in the absence of a contemporaneous objection, we review a trial court's failure to address alleged prosecutorial misconduct for plain error. *People v. Vialpando*, 2022 CO 28, ¶ 20. "To constitute plain error, misconduct must be flagrant or glaring or tremendously improper, and it must so undermine the fundamental fairness of the trial as to cast serious doubt on the reliability of the judgment of conviction." *People v. Rhea*, 2014 COA 60, ¶ 43 (quoting *People v. Weinreich*, 98 P.3d 920, 924 (Colo. App. 2004)).

¶ 60     During closing argument, a prosecutor "may refer to the strength and significance of the evidence, conflicting evidence, and reasonable inferences that may be drawn from the evidence." *People v. Walters*, 148 P.3d 331, 334 (Colo. App. 2006). However, a

prosecutor's "arguments and rhetorical flourishes must stay within the ethical boundaries" the courts have drawn. *Domingo-Gomez v. People*, 125 P.3d 1043, 1048 (Colo. 2005). One of those ethical boundaries is not intentionally misstating the evidence or the law. *Id.* at 1049; *see also Herold*, ¶ 69; *Vialpando*, ¶ 44.

## B.  Misstatement of the Evidence

¶ 61    We first reject Barber's assertion that the trial court reversibly erred by allowing the prosecutor to misstate the evidence.

¶ 62    In closing argument, while recounting the evidence in the case, the prosecutor said,

> You have [Barber's] statements. . . .  What did he tell Special Agent Ackerman that day when they went and talked to him?  That January 24th of 2019 day, *he said, yes, I browse porn at night*.

(Emphasis added.)  Defense counsel objected that the argument misstated the evidence.  The court overruled the objection, stating that the "[j]ury will determine what the evidence was."

¶ 63    Barber asserts that the prosecutor misstated the evidence because Barber's actual statement to Ackerman was that he viewed pornography "but he wasn't really into it anymore."  In Barber's view, the prosecutor's use of the present tense reframed his

statement into an admission that he watched pornography at the time investigators searched his apartment.

¶ 64    Even assuming, however, that the prosecutor misstated the evidence, we conclude that any error in allowing the statement didn't prejudice Barber. The relevant issue was when Barber viewed any *child* pornography — not *general* pornography. Yet the prosecutor clarified, soon after the challenged statement, that Barber had admitted "he's looked at child porn *in the past.*" (Emphasis added.) Later in closing, the prosecutor again reiterated that Barber had admitted he'd looked at child porn "*in the past.*" (Emphasis added.) Additionally, the trial court's instruction to the jury after overruling the objection, reminding the jury that it decides what the evidence is, makes it less likely that the jury was improperly influenced by the argument. *See Vialpando*, ¶ 44.

¶ 65    Barber also asserts that it was a misstatement of the evidence to say he watched pornography "at night." But it was a reasonable inference from Ackerman's testimony that Barber said "he worked long nights as a flagman, so he had his phone with him," and "he would typically use phones" "to view pornography." At any rate,

24

Barber concedes, and we agree, that even if this was a misstatement, it is of little consequence.

¶ 66 Accordingly, any error by the trial court in allowing the prosecutor's statement was harmless. *See James*, ¶ 19.

### C. Misstatement of the Law

¶ 67 We also reject Barber's assertion that the trial court reversibly erred by allowing the prosecutor to misstate the law and, relatedly, to invite jurors to ignore an instruction requiring them to consider the two counts separately.

¶ 68 Because defense counsel didn't make a contemporaneous objection, we review this challenge for plain error. *See Vialpando*, ¶ 20. In doing so, we consider the prosecutor's statement in the context of the argument as a whole. *See Herold*, ¶ 70; *see also Lovato*, ¶ 63 (when determining whether arguments were improper, courts must "take into account defense counsel's 'opening salvo'" (quoting *People v. Perea*, 126 P.3d 241, 247 (Colo. App. 2005))).

¶ 69 Before closing arguments, the trial court read the instructions to the jury. As relevant here, instruction nine says,

> In this case a separate offense is charged against Mr. Barber in each count of the information. Each count charges a separate

and distinct offense and the evidence and the law applicable to each count should be considered separately, uninfluenced by your decision as to any other count. The fact that you may find Mr. Barber guilty or not guilty of one of the offenses charged, should not control your verdict as to any other offense charged against him.

Mr. Barber may be found guilty or not guilty of any one or all of the offenses charged.

¶ 70    During defense counsel's closing argument, he indicated that the crux of the case was the existence of reasonable doubt and emphasized that the prosecution's case was entirely circumstantial.

¶ 71    In response, during his rebuttal, the prosecutor explained the reasonable doubt standard using an analogy:

Reasonable doubt is a doubt based in reason. It is not one that is vague or speculative or imaginary.

And what [the] defense has brought up is a lot of speculation, vagaries, and imagining. But I want to draw your attention back to what the evidence actually shows in this case by drawing your attention to an analogy that I think hits it right on the head.

Man stopped on the street, found he has drugs in his pocket. Sir, where did you get these drugs in your pocket? How did you get these drugs from your pocket? It's not my pants. Okay. What about these drugs in your sock? Also not my socks. Okay. What about this Polaroid photograph of you holding today's

26

newspaper purchasing the drugs one block
away in your shirt pocket?  Oh, that's not real.

At a certain point, it's just not reasonable to go
along with that logic.  At a certain point, you're
entering into the territory of vague,
speculative, and imaginary and flatout
unreasonable doubt because every single sign,
every single indicator points to [Barber].

¶ 72    The prosecutor then compared this case to his analogy.  This

is when he made the alleged misstatement of the law:

The facts in this case are the drugs in the
pocket and the drugs in the sock and the
Polaroid photo. . . .

If it's just the Google drive, maybe you have
questions.  If it's just the phone, maybe you
have questions.  If it's just the other phone,
maybe you have a question.  But at a certain
point, when the evidence just keeps stacking
up and keeps stacking up and all of the arrows
keep pointing back to one place and one place
only, it's beyond a reasonable doubt.  There is
no reasonable doubt left in this case.

¶ 73    While the prosecutor's statement could be interpreted as

suggesting that the jury consider the Google Drive evidence and the

phone evidence in conjunction to determine whether Barber was

guilty of both counts, the prosecutor never explicitly told the jury to

do so or to ignore instruction nine.  Though Barber contends that

the prosecutor's remarks "effectively asked the jury to consider the

evidence of each count as propensity evidence to support the other count," there is no indication that any juror understood the remarks that way. *See People v. Krueger*, 2012 COA 80, ¶ 55. Instead, the prosecutor may have intended the remarks, and the jurors may have taken them, as more of a general commentary on the credibility of the defense's theory of the case on the two counts. And, to be sure, the evidence that Barber admitted having a phone with bookmarks to child pornography websites was relevant to — and could be considered in conjunction with — both counts.

¶ 74 Additionally, when read in context, it is apparent that the prosecutor's remarks were intended to rebut the defense's argument that the prosecution's case was built on speculation and failed to meet the beyond a reasonable doubt standard.

¶ 75 Accordingly, we perceive no error, let alone plain error, by the trial court. *See People v. Sanders*, 2022 COA 47, ¶¶ 54-55, *aff'd on other grounds*, 2024 CO 33; *see also People v. Strock*, 252 P.3d 1148, 1153 (Colo. App. 2010) (a prosecutor may use rhetorical devices and oratorical embellishment in closing argument).

¶ 76 But even assuming the prosecutor's analogy misstated the law, the trial court didn't plainly err by not striking it. The court

instructed the jury to consider each count separately. Because

"[w]e presume that the jury followed the court's instructions, absent

evidence to the contrary," *Garcia*, 2012 COA 79, ¶ 20, and because

the prosecutor's analogy was not a "flagrant or glaring or

tremendously improper" misstatement of law, *Rhea*, ¶ 43 (quoting

*Weinreich*, 98 P.3d at 924), we conclude that any error doesn't rise

to the level of plain error.

## V. Expert Testimony

¶ 77 Barber also contends that the trial court erred by admitting

opinion testimony from an expert witness. Specifically, he asserts

that an expert's reference to two images from the cell phone as

"sexually exploitative material" impermissibly usurped the role of

the jury. We disagree.

### A. Standard of Review and Applicable Law

¶ 78 We review a trial court's ruling admitting expert testimony for

an abuse of discretion. *People v. Cooper*, 2021 CO 69, ¶ 44.

¶ 79 While an expert may provide testimony that "embraces an

ultimate issue to be decided by the trier of fact," CRE 704, an expert

"may not usurp the function of the jury." *People v. McMinn*, 2013

COA 94, ¶ 51.

¶ 80    To determine whether an expert usurped the jury's function, we consider factors such as (1) whether the expert's testimony was clarified on cross-examination; (2) whether the expert expressed an opinion of the applicable law or legal standards; (3) whether the jury was properly instructed on the law and the fact that it may accept or reject the expert's opinion; and (4) whether the expert opined that the defendant committed the crime or that there was a particular likelihood that the defendant committed the crime. *People v. Rector*, 248 P.3d 1196, 1203 (Colo. 2011).

## B.    Additional Facts

¶ 81    Jim Stevens, who worked for the FBI and was qualified as an expert information technology forensic examiner, testified about his extraction and inspection of information from the cell phones found in Barber's motel room, including the phone with the images relevant to count 2.  The prosecution introduced those images through his testimony.

¶ 82    When asked about one of the images, Stevens said he recognized it as "an image that also depicts child exploitation." Defense counsel objected, arguing that Stevens's statement was a legal conclusion.  The court overruled the objection on the basis

that the statement was "an opinion" and was "explaining what he did during his investigation."

¶ 83    Later, during redirect examination, the prosecutor asked,

> Q.    [I]n this case, during [your] visual inspection, did you identify photos on this device that you . . . thought were significant enough to pass along to the special agent?
>
> A.    So on the [phone], it was going to be the six pictures that was in the last exhibit that you showed me.
>
> Q.    In People's Exhibit 57.
>
> A.    Yes.  The ones with the six pictures, yes.
>
> Q.    And so those were based on your visual inspection indicative of sexually exploitative material.
>
> A.    Yes.  Uh-huh.

Defense counsel again objected that Stevens was giving a legal conclusion.  The court again overruled the objection.

### C.    Analysis

¶ 84    We conclude that the trial court didn't abuse its discretion by admitting Stevens's challenged testimony for three reasons.

¶ 85    First, Stevens didn't opine on the applicable law or legal standards; at most, he only offered a factual opinion.  *Cf. People v. Baker*, 178 P.3d 1225, 1233 (Colo. App. 2007) ("Whether an injury

qualifies as a 'serious bodily injury' is a question of fact for the jury."). He didn't explain what makes something sexually exploitative, nor did he describe what about the pictures made them sexually exploitative in his view. Instead, he simply testified that based on his visual inspection of the images, he believed they were "indicative of sexually exploitative material," which is why he passed them on to the special agent. The fact that he used the phrasing from the statute doesn't mean his statement usurped the role of the jury. *See People v. Martinez*, 608 P.2d 359, 360-61 (Colo. App. 1979) (the trial court didn't err by allowing an expert witness to testify "that the victim's injuries amounted to serious bodily injury in the language of the statutes").

¶ 86    Second, the trial court properly instructed the jury on the statutory definition of "sexually exploitative materials," *see* § 18-6-403(2)(j), C.R.S. 2018, and on its ability to accept or reject any expert testimony. *See Lawrence v. People*, 2021 CO 28, ¶ 53 (an expert's opinion that an investment qualified as a "security" didn't usurp the jury's role, in part because the trial court instructed the jury on the statutory definition of a "security" and on its ability to accept or reject expert testimony). Again, absent evidence to the

contrary, we presume that the jury followed the court's instructions. *See Garcia*, 2012 COA 79, ¶ 20.

¶ 87 And third, Stevens didn't opine on whether Barber actually committed the charged crimes. Stevens didn't testify that Barber was guilty of possessing sexually exploitative materials; nor did he even testify that the images on the cell phone met the statutory definition of sexually exploitative materials or that Barber possessed the images or the cell phone on which they were found. Instead, he just testified about his own role in the investigation, which was to extract the contents of some phones, without knowing anything about the owner or the context of the investigation, and, as he put it, to pass along images "that would be photos of interest in a case involving child exploitation." *Cf. People v. Penn*, 2016 CO 32, ¶ 32 ("[I]n some circumstances, police officers may testify about the reasons they took certain investigative steps, even where this testimony touches upon prohibited subjects.").

## VI. Cumulative Error

¶ 88 Barber further contends that the cumulative effect of the alleged errors deprived him of a fair trial, requiring reversal of his convictions. Having already concluded that the conviction on

count 1 must be reversed due to the hearsay errors, we consider this contention only with respect to count 2, and we conclude that no cumulative error warrants reversal.

¶ 89 Although a single irregularity in a criminal trial may be deemed harmless, "[n]umerous formal irregularities . . . may in the aggregate show the absence of a fair trial, in which event a reversal would be required." *People v. Sauser*, 2020 COA 174, ¶ 106 (alteration in original) (quoting *Howard-Walker v. People*, 2019 CO 69, ¶ 24). But we won't reverse a conviction unless the cumulative effect of more than one error "substantially prejudice[d] the defendant's right to a fair trial." *Id.* (quoting *People v. Whitman*, 205 P.3d 371, 387 (Colo. App. 2007)).

¶ 90 The only error we've identified in Barber's trial was an error in admitting hearsay evidence — an error that we've concluded doesn't require reversal of count 2. Yet "[t]he doctrine of cumulative error requires that numerous errors be committed, not merely alleged." *Id.* And even if we assume that the trial court erred by allowing the prosecutor to make the "drugs in the pocket, drugs in the sock, and Polaroid photo" analogy in closing argument — an issue we didn't resolve, as we concluded that any error was harmless — those two

potential errors, even combined, didn't deprive Barber of a fair trial. *See id.* at ¶ 107.

## VII. Habitual Sex Offender Sentencing[3]

¶ 91 Barber also contends that the trial court plainly erred by subjecting him to enhanced sentencing under the habitual sex offenders against children statute in violation of the Sixth Amendment. Specifically, he contends that the court erroneously concluded that the victim of his prior sexual offense was under the age of fifteen when that fact required a jury finding. We agree.

### A. Standard of Review and Applicable Law

¶ 92 Typically, we review constitutional challenges to a trial court's sentencing determinations de novo. *People v. Kirby*, 2024 COA 20, ¶ 55. However, because Barber didn't preserve his constitutional challenge, "we will vacate his sentences only if we conclude that the court's error was plain and so undermined the fundamental

---

[3] After the parties had completed briefing in this case, the United States Supreme Court issued its opinion in *Erlinger v. United States*, 602 U.S. ___, 144 S. Ct. 1840 (2024). At the People's request, we ordered supplemental briefing on the impact of *Erlinger* on this issue.

35

fairness of the trial as to cast serious doubt on the reliability of the sentences." *Id.*; *see also Clark*, ¶ 123.

¶ 93  The United States Supreme Court has long held that, "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt" in accordance with the Sixth Amendment to the United States Constitution. *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000); *see also Mountjoy v. People*, 2018 CO 92M, ¶ 11; *Misenhelter v. People*, 234 P.3d 657, 660 (Colo. 2010); *Villanueva v. People*, 199 P.3d 1228, 1232 (Colo. 2008). It has also long held that "the 'statutory maximum' for *Apprendi* purposes is the maximum sentence a judge may impose *solely on the basis of the facts reflected in the jury verdict or admitted by the defendant.*" *Blakely v. Washington*, 542 U.S. 296, 303 (2004); *see also Mountjoy*, ¶¶ 12-14; *Misenhelter*, 234 P.3d at 660; *Villanueva*, 199 P.3d at 1232-33.

¶ 94  There is an exception to this *Apprendi-Blakely* rule for findings on the fact of a prior conviction. *See Almendarez-Torres v. United States*, 523 U.S. 224, 246-47 (1998). The Supreme Court has recognized that making such findings may involve looking at so-

called *Shepard* documents: the statutory definition, the charging document, a written plea agreement, a plea colloquy transcript, and any explicit trial court findings to which the defendant assented. *Shepard v. United States*, 544 U.S. 13, 16 (2005) (plurality opinion).

¶ 95　　But the Supreme Court has circumscribed the facts that fall within this exemption.  For instance, in *Mathis v. United States*, the Court emphasized that a sentencing judge "can do no more, consistent with the Sixth Amendment, than determine what crime, with what elements, the defendant was convicted of."  579 U.S. 500, 511-12 (2016).  "That means a judge cannot go beyond identifying the crime of conviction to explore the manner in which the defendant committed that offense."  *Id.* at 511.  "He is prohibited from conducting such an inquiry himself; and so too he is barred from making a disputed determination about 'what the defendant and state judge must have understood as the factual basis of the prior plea' or 'what the jury in a prior trial must have accepted as the theory of the crime.'"  *Id.* (quoting *Shepard*, 544 U.S. at 25).

¶ 96　　In the recent case of *Erlinger v. United States*, the Supreme Court again reiterated that the prior criminality exception is "a 'narrow exception' permitting judges to find only 'the fact of a prior

conviction.'" *Erlinger v. United States*, 602 U.S. ___, ___, 144 S. Ct. 1840, 1853-54 (2024) (quoting *Alleyne v. United States*, 570 U.S. 99, 111 n.1 (2013) (plurality opinion)).  The Court also noted that it had "reiterated this limit on the scope of *Almendarez-Torres* 'over and over,' to the point of 'downright tedium.'"  *Id.* at ___, 144 S. Ct. at 1854 (quoting *Mathis*, 579 U.S. at 510); *see also id.* at ___, 144 S. Ct. at 1854 n.2 (compiling cases).

## B.  Additional Facts

¶ 97    The complaint and information included a habitual sex offender against children count under section 18-3-412, C.R.S. 2024.  As relevant here, this statute requires enhanced sentencing for anyone convicted of a sexual offense "who has been previously convicted under the laws of any other state . . . of an unlawful act that, if committed within this state, would be an unlawful sexual offense."  § 18-3-412(2).  For purposes of this statute, an "unlawful sexual offense" is defined to include various sexual offenses proscribed under Colorado law — some generally and others only where the victim is under age fifteen.  § 18-3-412(1).

¶ 98    At sentencing, the prosecution introduced evidence that Barber pleaded guilty in North Carolina in 2000 to the offense of

taking indecent liberties with a child. In North Carolina, that offense requires that the victim be under the age of sixteen. N.C. Gen. Stat. Ann. § 14-202.1(a) (2024).

¶ 99 The indictment in the North Carolina case lists the victim's date of birth as November 26, 1984, and lists the charged period for the relevant offense as November 11 through December 18, 1999, which would've spanned the victim's fifteenth birthday. However, the entry of judgment lists the date of the offense only as December 18, 1999, after the victim's fifteenth birthday.

¶ 100 One of the primary issues at the sentencing phase of this case was whether the conviction in North Carolina triggered Colorado's habitual sex offender against children statute. The parties agreed that it was a qualifying sexual offense, so long as it was committed against a victim under the age of fifteen, but they disagreed whether the case records could establish that the victim was under age

fifteen at the time of the offense.[4]  On that issue, the court found

that the victim was under fifteen, reasoning that Barber had

"pleaded guilty to th[e] indictment" that alleged the offense had

"occur[ed] from 11/18 through 12/18."  Accordingly, the court

applied the habitual sentencing provisions, which required a

sentence of three times the presumptive maximum sentence.

### C.    Analysis

¶ 101    The parties agree, as do we, that the fact of Barber's prior

conviction for taking indecent liberties with a child fell within the

prior criminality exception to *Apprendi* and *Blakely*.  *See*

*Almendarez-Torres*, 523 U.S. at 246-47.  But that only gets the

People so far.

¶ 102    Under the *Apprendi-Blakely* line of cases, the trial court could

only find the fact of the prior conviction and the elements of that

---

[4] It's unclear to us which Colorado sexual offense aligns with the North Carolina offense of taking indecent liberties with a child, and whether it's one of the Colorado offenses that requires a victim to be under age fifteen in order to qualify for habitual sex offender sentencing.  But because the parties agreed, both in the trial court and in this appeal, that the North Carolina offense aligns with one of the Colorado offenses requiring that the victim be under age fifteen, we assume that to be the case and don't consider the issue further.

conviction — no more.  And the elements, as we've indicated, include that the victim was under the age of sixteen.  To make a further finding that the victim was not just under age sixteen but actually under age fifteen required a finding by a jury beyond a reasonable doubt.  *See Apprendi*, 530 U.S. at 490; *Blakely*, 542 U.S. at 303; *Mathis*, 579 U.S. at 511-12.

¶ 103    While the People are correct that under *Shepard,* the trial court could rely on things like the charging instrument and the plea agreement, such reliance was still limited to determining the crime and elements Barber was convicted of in North Carolina.  *See Mathis*, 579 U.S. at 511-12; *see also Erlinger*, 602 U.S. at ___, 144 S. Ct. at 1854 ("To ensure compliance with the Fifth and Sixth Amendments, a sentencing judge may use the information he gleans from *Shepard* documents for the 'limited function' of determining the fact of a prior conviction and the then-existing elements of that offense.  '[N]o more' is allowed.") (alteration in original) (citations omitted); *Mathis*, 579 U.S. at 504-06 (*Shepard* merely recognized that additional documents may assist in determining what elements were at issue with a divisible statute that can be violated in different ways).

¶ 104    Nor is it clear, at any rate, from the plea agreement or any of the other documents from the North Carolina case that Barber actually pleaded guilty to an offense committed when the victim was fourteen.  Even *Shepard*, which recognized that some facts underlying a guilty plea can be gleaned from other case documents, limited its inquiry to those facts that "an earlier guilty plea *necessarily* admitted."  544 U.S. at 16 (emphasis added); *see also id.* at 21, 24, 26.  We cannot say, based simply on the fact that the period charged in the indictment spanned a time when the victim was fourteen, that Barber's later guilty plea *necessarily* admitted that he committed the offense during the time when the victim was fourteen.  All he necessarily admitted was that he committed the offense at some unspecified time within the charged period.  Indeed, the entry of judgment suggests that Barber only admitted to an offense on December 18, 1999, after the victim had turned fifteen.

¶ 105    Accordingly, we conclude that it was error for the trial court to make its own factual determination of whether Barber's prior conviction involved an offense at the time the victim was fourteen.

¶ 106    Moreover, we conclude that the court's error was plain because it was both obvious and substantial.

42

¶ 107    First, the error was obvious because it violated well-settled case law. *See People v. Crabtree*, 2024 CO 40M, ¶ 42 ("[T]o be deemed plain, an error must contravene a clear statutory command, a well-settled legal principle, or established Colorado case law."). In a long line of cases, the United States Supreme Court has reiterated the limits of the *Apprendi-Blakely* prior criminality exception. This includes *Mathis*, which preceded the sentencing in this case, in which the Supreme Court made clear that a court is limited to "determin[ing] what crime, with what elements, the defendant was convicted of." 579 U.S. at 511-12.

¶ 108    The People argue that any error wasn't obvious because the trial court didn't have the guidance from *Erlinger* at the time of the sentencing proceedings in early 2022. But the Supreme Court's ruling in *Erlinger* didn't materially change the law on this issue; rather, it compiled its previous cases on the issue, repeated its rulings from those cases, and commented on how it had "reiterated" those rulings numerous times, "to the point of 'downright tedium.'" *Erlinger*, 602 U.S. at ___, 144 S. Ct. at 1853-54 (quoting *Mathis*, 579 U.S. at 510).

¶ 109     The People also argue that the trial court's finding comported with existing Colorado case law on the prior criminality exception, citing two older Colorado Supreme Court cases that describe the exception, seemingly more broadly, as applying to "facts regarding prior convictions." *See Lopez v. People*, 113 P.3d 713, 719 (Colo. 2005); *People v. Huber*, 139 P.3d 628, 633 (Colo. 2006). But the exception, which is based on the bounds of the Sixth Amendment, has always been limited to those facts authorized by the United States Supreme Court: the fact of the prior conviction and the elements of that crime. *See Lopez*, 113 P.3d at 722-23; *Huber*, 139 P.3d at 632-33. Indeed, more recent Colorado Supreme Court cases preceding the sentencing described the exception accurately as limited to "the fact of a prior conviction." *See, e.g., People v. Viburg*, 2021 CO 81M, ¶ 27; *Mountjoy*, ¶ 15; *Misenhelter*, 234 P.3d at 660. And one of those cases even noted the discrepancy in the earlier case law, where the court had used "regarding" in place of "of" to describe the exception, and confirmed that the court was adopting the language from *Blakely*. *Mountjoy*, ¶ 15 n.2.

¶ 110     Second, we conclude that the error was substantial, as it led to a mandatory sentence of three times the presumptive maximum

sentence. For count 2, this meant a sentence of nine years instead of one to three years. *See* § 18-1.3-401(1)(a)(V)(A.1), C.R.S. 2024; *see also People v. Elie*, 148 P.3d 359, 366 (Colo. App. 2006) (a *Blakely* error in sentencing "affected [the] defendant's substantial rights" by affecting the sentence the trial court imposed).

¶ 111 Therefore, we vacate Barber's sentence on count 2, and we remand the case for resentencing within the presumptive range. *See People v. Isaacks*, 133 P.3d 1190, 1196 (Colo. 2006).

¶ 112 We decline to consider the People's request, raised for the first time in its supplemental brief, that the case be remanded for a jury trial on the habitual sex offender against children count. *See People v. Valles*, 2013 COA 84, ¶ 9 (declining to consider a contention the People didn't make in their answer brief but raised for the first time at oral argument); *Ackerman v. City & Cnty. of Denver*, 2015 COA 96M, ¶ 37 (declining to consider a contention raised for the first time in supplemental briefing ordered on a different issue).[5]

---

[5] Because we vacate Barber's sentence on count 2 on this basis, we needn't consider his challenge to the sentence on sufficiency of the evidence grounds.

## VIII. Disposition

¶ 113 The judgment of conviction on count 1 is reversed and remanded for a new trial. The judgment of conviction on count 2 is affirmed, but the sentence for that conviction is vacated and remanded for resentencing within the presumptive range.

JUDGE DUNN and JUDGE NAVARRO concur.