21CA0963 Peo v Pope 10-24-2024

COLORADO COURT OF APPEALS

Court of Appeals No. 21CA0963
Jackson County District Court No. 19CR24
Honorable Stephen J. Jouard, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Douglas Dean Pope,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division VII
Opinion by JUDGE SCHUTZ
Tow and Pawar, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced October 24, 2024

Philip J. Weiser, Attorney General, Josiah Beamish, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Casey Mark Klekas, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    Defendant, Douglas Dean Pope appeals the judgment of conviction entered on a jury verdict finding him guilty on one count of second degree assault (serious bodily injury).  We affirm.

## I.    Background and Procedural History

### A.    The Assault and Immediate Aftermath

¶ 2    In December 2019, Tina[1] and Douglas Pope, who had been married for five years, were involved in an argument after Tina accidently damaged Pope's guitar.  After a tense few days, Tina suggested that Pope spend some time at a hotel because they were "cooped up" together in their home.  He declined to leave, so Tina decided to stay at a hotel.

¶ 3    When Tina informed him of her decision to leave, Pope, who stood six feet five inches tall and weighed around 300 pounds, grabbed her by the arm, cornered her in the kitchen, and repeatedly punched her in the head and neck, as she crouched below him.  Tina testified that after Pope stopped hitting her, she saw "black

---

[1] Because Tina and Douglas share the same last name, to avoid confusion we will refer to Tina by her first name.  We mean no disrespect by doing so.

stars" and felt dizzy and nauseous but remained conscious. She fled to their home office and barricaded the door with a chair.

¶ 4 Pope called 911 and told the dispatcher that he had hit Tina and "needed to be picked up." Officers arrested him when they arrived at the home.

¶ 5 Officers testified that Tina had significant bruising and abrasions on her neck and face. Paramedics transported Tina to the hospital where Dr. Lynette Telck examined her. Dr. Telck diagnosed her with post-traumatic headache, not intractable, which means that the injury was not so "completely overwhelming that [Tina was not] at least . . . able to walk and communicate her concerns."

¶ 6 After a series of follow-up appointments, Dr. Telck concluded Tina had suffered a concussion during the attack. Dr. Telck described a concussion as "a physical injury to the organ of the brain." At a further follow-up appointment in February 2020, after Tina reported ongoing issues with headaches, dizziness, and balance, Dr. Telck referred her to physical therapy to address the concussion.

¶ 7    Prior to the assault, Tina had been diagnosed with diabetes and epilepsy. Tina did not initially disclose her medical history to Dr. Telck, but Dr. Telck learned about it when preparing for subsequent appointments.

¶ 8    In April 2020, Pope's counsel requested that Tina be referred for a neuropsychological evaluation to explore the scope of her injuries, but Tina never followed through with the referral.

¶ 9    In May 2020, six months after the assault, Tina met virtually[2] with Dr. Sarah Yang, a neurologist. Tina reported that she was experiencing daily headaches, frequent migraines, dizziness, balance issues, behavioral changes, and memory loss. She also reported frequent noise and light sensitivity, as well as head and neck pain. After the consultation, Dr. Yang referred Tina for an MRI.

¶ 10    Dr. Yang testified that Tina's symptoms were consistent with post-concussive syndrome, a brain injury that results from the brain moving back and forth in the skull. Such movement can

_____

[2] Dr. Yang's consultations with Tina took place in spring 2020. Due to the COVID-19 pandemic, in-person visits were limited, and she did not physically examine Tina.

damage the brain's neurons and cells. Dr. Yang also noted that Tina's symptoms could also be attributable to post-traumatic stress disorder or pseudodementia.

### B. The Trial and Conviction

¶ 11    Pope was charged with false imprisonment[3] and second degree assault (serious bodily injury). The matter was set for a jury trial.

¶ 12    The primary disputed issue at trial was whether Pope caused serious bodily injury to Tina. Serious bodily injury is

> bodily injury that either at the time of the actual injury or at a later time, involves a substantial risk of death; a substantial risk of serious permanent disfigurement; a substantial risk of protracted loss or impairment of the function of any part or organ of the body; or breaks, fractures, a penetrating knife or penetrating gunshot wound, or burns of the second or third degree.

§ 18-1-901(3)(p), C.R.S 2024.[4]

---

[3] The trial court acquitted Pope on the false imprisonment charge at the conclusion of the People's evidence after finding that there was not sufficient evidence to submit the count to the jury.

[4] At trial and on appeal, the parties agreed that the only potential basis for a finding that Tina suffered a serious bodily injury was "the substantial risk of protracted loss or impairment of the function of any part of the body."

¶ 13    In addition to testimony from Dr. Telck and Dr. Yang, the jury also heard from Dr. Jenna Miller, a neuropsychologist who testified that Tina's injuries were not consistent with a concussion and explained that her subsequent symptoms could be attributed to other factors such as underlying medical conditions or stress.

¶ 14    During deliberations, the jury asked the court for the legal definitions of "protracted" and "impairment."  The court responded to the question stating, "you have been given all the instructions of law you may properly consider."

¶ 15    The jury returned a guilty verdict on second degree assault (serious bodily injury).  The trial court sentenced Pope to six years in the custody of the Department of Corrections.

¶ 16    Pope appeals the judgment of conviction, arguing that (1) the verdict was not supported by sufficient evidence; (2) the definition of serious bodily injury is unconstitutionally vague; (3) the trial court erred by improperly allowing expert witnesses to offer a legal opinion as to whether Tina suffered serious bodily injury; and (4) the court erred by preventing Pope's counsel from fully cross-examining Tina.  We address these contentions in turn.

## II.    Sufficiency of the Evidence

¶ 17    Pope contends that the prosecution failed to present sufficient evidence to prove that Pope caused Tina "a substantial risk of protracted loss or impairment of the function of any part or organ of the body" and therefore, his conviction must be reversed.

### A.    Standard of Review and Applicable Law

¶ 18    We review the record de novo to determine whether the evidence was sufficient both in quantity and quality to sustain a conviction.  *Clark v. People*, 232 P.3d 1287, 1291 (Colo. 2010).

¶ 19    To determine whether the prosecution presented sufficient evidence, we consider "whether the relevant evidence, both direct and circumstantial, when viewed as a whole and in the light most favorable to the prosecution, is substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt."  *Id.* (quoting *People v. Bennett*, 515 P.2d 466, 469 (Colo. 1973)).  In jury trials, the *jury* "decides difficult questions about the weight it determines to give conflicting evidence."  *Id.* at 1293.  Appellate courts do not sit as a thirteenth juror to second-guess the jury's weighing of the evidence.  *See id.*

¶ 20    As relevant in this case, serious bodily injury is an injury that, at or after the time the injury was incurred, involves a substantial risk of protracted loss or impairment of the function of any part or organ of the body.  § 18-1-901(3)(p).  The facts of the actual injury control determination of serious bodily injury, not "the risk generally associated with the type of conduct or injury in question." *People v. Vigil*, 2021 CO 46, ¶ 33 (interpreting the substantial risk of death component of serious bodily injury).

## B.    Application

¶ 21    Pope contends that there was insufficient evidence as a matter of law for the jury to find that he caused Tina protracted loss or impairment of any part or area of her body.  Specifically, Pope focuses on the following evidence: (1) Tina had underlying medical issues, such as diabetes, which potentially caused or contributed to her post-assault symptoms; (2) Tina's subsequent behavior, such as not completing the neuropsychological evaluation in April 2020 and missing follow-up appointments with Dr. Telck, indicate that her injury may not have been as serious as the prosecution argued; and (3) the testimony offered by Tina and the expert witnesses did not support the jury's serious bodily injury finding beyond a reasonable

doubt because her symptoms can be explained by causes independent of the assault.

¶ 22    Viewing the evidence in the light most favorable to the prosecution, we conclude that there was sufficient evidence that Pope caused serious bodily injury to Tina.  The jury could have plausibly found beyond a reasonable doubt that Pope actually caused Tina to suffer a "protracted loss or impairment of the function" of her brain based on the following evidence: (1) Tina's testimony that Pope repeatedly punched her head like a "jackhammer"; (2) Pope's admission to the 911 dispatcher that he "needed to be picked up" after hitting Tina; (3) photos of Tina after the assault; (4) testimony from Tina's treating physicians that her subsequent symptoms were consistent with injuries stemming from the assault; and (5) testimony that Tina was diagnosed with a concussion and then post-concussive disorder, after the assault. The jury also heard testimony, as discussed more fully below, that Tina's injuries created a substantial risk of protracted impairment of her brain function.

¶ 23    Viewing this evidence in the light most favorable to the prosecution, we conclude that a reasonable jury could find beyond

a reasonable doubt that Pope caused serious bodily injury to Tina, and therefore, we reject Pope's sufficiency challenge.

## III. Void for Vagueness

¶ 24    Pope next argues the term "protracted loss or impairment" is unconstitutionally vague and therefore violates his right to equal protection under the federal and state constitutions. Not so.

### A. Standard of Review and Applicable Law

¶ 25    Pope did not raise his void for vagueness argument before the trial court. Nevertheless, we may reach the merits of unpreserved constitutional claims under limited circumstances. *See People v. Devorss*, 277 P.3d 829, 834 (Colo. App. 2011).

¶ 26    A statute's constitutionality is a question of law that we review de novo. *People v. Torline*, 2020 COA 160, ¶ 8. "A statute is facially void for vagueness if it is incomprehensible in all of its applications." *Devorss*, 277 P.3d at 835. The challenger has the burden to prove a statute is unconstitutional beyond a reasonable doubt. *Torline*, ¶ 8.

¶ 27    To prevail on a vagueness challenge the defendant must show that the statute "forbids or requires the doing of an act in terms so vague that persons of ordinary intelligence must necessarily guess

as to its meaning and differ as to its application." *Devorss*, 277 P.3d at 835 (quoting *People v. Gross*, 830 P.2d 933, 937 (Colo. 1992)). A defendant may challenge a statute's constitutionality as applied to them or facially. To prevail on a claim that a statute is vague as applied, a defendant must establish that the "[statute] does not, with sufficient clarity, prohibit the conduct against which it is to be enforced." *People v. McIntier*, 134 P.3d 467, 475 (Colo. App. 2005). An as-applied challenge is therefore based on the particular defendant's conduct. *Id.* In contrast, to establish a claim that a statute is facially unconstitutional, a defendant must prove beyond a reasonable doubt that the statute is unconstitutionally vague in all its potential applications. *People v. Houser*, 2013 COA 11, ¶ 41.

## B. Application

¶ 28 As an initial matter, Pope never expressly states whether he challenges the application of section 18-1-901(3)(p) as applied or on its face. However, he does not develop any factual argument explaining why the statute is unconstitutional as specifically applied to his conduct. Moreover, Pope failed to develop his as-applied challenge in the trial court. Because an as-applied

challenge must be based on specific facts developed in the trial court, and no such facts were developed here, we decline to address Pope's as-applied challenge. *See People v. Stone*, 2020 COA 23, ¶ 49 ("We do not consider as-applied challenges that are not presented to the trial court . . . .").

¶ 29    To prevail on his facial challenge, Pope must prove beyond a reasonable doubt that section 18-1-901(3)(p) "forbids or requires the doing of an act in terms so vague that persons of ordinary intelligence must necessarily guess as to its meaning and differ as to its application." *Devorss*, 277 P.3d at 835. Though Pope correctly notes that neither the phrase "protracted loss or impairment" nor its constituent components are defined by statute, he presents no evidence that persons of ordinary intelligence cannot understand the meaning of the term.

¶ 30    Moreover, Pope concedes, there is case law that delineates the difference between various types of harm and distinguishes serious bodily injury from bodily injury. *See People v. Brown*, 677 P.2d 406, 409 (Colo. App. 1983). Furthermore, divisions of this court have previously determined that the terms "serious bodily injury," "substantial," "protracted," and "impairment" are not considered

11

unconstitutionally vague merely because section 18-1-901(3)(p) does not define the terms.  *See People v. Duncan*, 2023 COA 122, ¶ 28 (collecting cases).

¶ 31   Though we are not bound by the decisions of other divisions of this court, we see no reason to depart from these holdings, particularly given the lack of evidence or authority suggesting that people of ordinary intelligence cannot understand the meaning of "protracted loss or impairment."  This is particularly true when, as here, a defendant fails to assert his facial challenge in the trial court.  *Id.* at ¶ 28 (In light of existing case law rejecting constitutional challenges to the definition of serious bodily injury, "the trial court could not reasonably have been expected to intervene sua sponte and find the statute unconstitutionally vague.").  We therefore reject Pope's facial challenge.

## IV.   Improper Expert Testimony

¶ 32   Pope contends that the trial court erred by allowing Dr. Telck and Dr. Yang to provide legal opinions about whether Tina's injuries met the definition of serious bodily injury.  Even though we conclude that this testimony crossed into legal opinions, we ultimately conclude that the trial court did not abuse its discretion

by admitting the evidence, and to the extent the court did abuse its discretion, any error was harmless.

## A. Additional Facts

¶ 33    The day before the trial started, Pope's counsel filed a motion objecting to Dr. Telck's and Dr. Yang's proposed testimony offering an opinion about whether Tina suffered "serious bodily injury." The next morning, at a pretrial conference, the parties argued the merits of the motion. The trial court found that Dr. Telck's and Dr. Yang's proposed testimony on whether Tina suffered serious bodily injury also could be characterized as a medical/legal definition and therefore the opinions were admissible. The court noted that the jury would be specifically instructed that they may accept or reject any testimony, including that of an expert witness.

¶ 34    At trial, the prosecution asked Dr. Telck whether she was familiar with a law enforcement document known as a serious bodily injury form (SBI form). Dr. Telck testified that she was familiar with the SBI form and that she signed one on the day she first examined Tina. The prosecutor then asked her about the form's content:

[Prosecutor]: [D]id you also have to make an assessment about serious bodily injury?

[Telck]: I did.

[Prosecutor]: So you're familiar with the medicolegal definition[5] of serious bodily injury that was on that form?

[Telck]: I am.

. . .

[Prosecutor]: All right. So on that form there is a definition of serious bodily injury?

[Telck]: There is.

[Prosecutor]: Are you familiar with that definition?

[Telck]: I am.

[Prosecutor]: And is that because you had encountered it before?

[Telck]: Yes, that is correct.

[Prosecutor]: And so have you had an opportunity to fully consider that definition?

[Telck]: I have.

---

[5] This term is potentially misleading because it implies that a legal definition incorporating medical concepts are inherently inseparable, and therefore any opinion concerning the ultimate legal issue is proper for a qualified physician to make. For the reasons explained more fully below, we reject this suggestion.

> [Prosecutor]: Did you have an opportunity to
> fully consider that definition on the day of the
> assault?
>
> [Telck]: I did.

¶ 35    The prosecutor asked Dr. Telck to elaborate on the SBI form's

content:

> [Prosecutor]: . . .[W]hen you're looking at that
> form, the serious bodily injury form, is there a
> definition of serious bodily injury on that
> form?
>
> [Telck]: There is.
>
> [Prosecutor]: What does that definition say?
>
> [Telck]: It says, Serious bodily injury, in
> quotes, means bodily injury which either at the
> time of the actual injury or at a later time
> involves a substantial risk of death, a
> substantial risk of serious permanent
> disfigurement, a substantial risk of protracted
> loss or impairment of the function of any part
> or organ of the body, or breaks, fractures, or
> burns of the second or third degree.
>
> [Prosecutor]: Okay.  So based on your
> familiarity with that definition and familiarity
> with the patient that day that you assessed
> her, did you make a determination that Tina
> Pope had suffered serious bodily injury?
>
> [Telck]: I did.
>
> . . .

[Prosecutor]: And the brain is -- when it says an organ of the body, is the brain an organ of the body?

[Telck]: It is, yes.

[Prosecutor]: Were you concerned about protracted loss of function of the organ, the brain?

[Telck]: Absolutely.

[Prosecutor] For what reason?

[Telck]: Because of the manner in which she was assaulted.

[Prosecutor]: Okay. And so typically can concussions cause protracted issues?

[Telck]: Absolutely. Concussions can cause all sorts of long-term issues.

[Prosecutor]: So on the date of the assault, under that definition of at the time of the assault or at a later date, there was substantial risk of what?

[Telck]: Of protracted injury to the brain.

¶ 36    On redirect examination, the prosecutors asked Dr. Telck if she stood by her assessment that Tina suffered serious bodily injury and — over defense counsel's objection — Dr. Telck responded that she did.

¶ 37    The prosecution next called Dr. Yang, who testified that in May 2020, Tina reported she was still persistently experiencing migraine headaches, light sensitivity, imbalance, nausea, leg numbness, and panic attacks. Dr. Yang opined that Tina's symptoms were consistent with post-concussive syndrome, which she described as an impairment of the brain caused by the sheering forces of a concussion that damage the brain's nerve cells and neurons.

¶ 38    Near the end of Dr. Yang's direct testimony, the prosecutor asked her to read the definition of serious bodily injury. The prosecutor then asked Dr. Yang the following questions:

> [Prosecutor]: [A]re you familiar with the term "serious bodily injury"?
>
> [Yang]: Yes.
>
> [Prosecutor]: And did you learn about that during the course of conversations preparing for this case?
>
> [Yang]: Yes, I did.

¶ 39    The prosecutor asked Dr. Yang to read the SBI form to herself and to read the statutory definition of serious bodily injury to the jury, again over defense counsel's objection. After she read the serious bodily injury definition from the form, the prosecutor asked:

17

[Prosecutor]: So based on that definition that you became familiar with and your assessment of [Tina], is it your medical opinion that [she] suffered serious bodily injury?

[Defense counsel]: We would renew all prior objections.

[The court]: Your objection has been noted and it's of record.

[Yang]: Yes, it is.

¶ 40    On redirect examination, the prosecutor asked Dr. Yang if it was her medical opinion that Tina suffered serious bodily injury. She answered "yes."

B.    Standard of Review

¶ 41    We review a trial court's evidentiary rulings for an abuse of discretion. *Campbell v. People*, 2019 CO 66, ¶ 21. We will not disturb the court's decision absent a showing that it was manifestly arbitrary, unreasonable, or unfair, or was based on a misapprehension or misapplication of the law. *People v. Elmarr*, 2015 CO 53, ¶ 20. An appellate court may affirm a trial court's decision on any ground supported by the record, whether relied upon or even considered by the trial court. *People v. Dyer*, 2019 COA 161, ¶ 39.

## C.     Applicable Law

¶ 42     Although an expert witness may provide testimony that embraces an ultimate issue of fact, an expert may not simply tell the jury what result to reach. *People v. Gaffney*, 769 P.2d 1081, 1087 (Colo. 1989); CRE 704 ("Testimony in the form of an opinion or inference otherwise admissible is not objectionable because it embraces an ultimate issue to be decided by the trier of fact."). Thus, an expert opinion is improper if it applies the facts of the case to a particular legal standard in a way that tells the jury that the legal standard has been satisfied. *People in Interest of J.R.*, 2021 COA 81, ¶ 31.  Moreover, it is improper for a witness to provide opinion testimony concerning that law. *People v. Prendergast*, 87 P.3d 175, 182 (Colo. App. 2003).

¶ 43     Although experts may offer testimony that embraces an ultimate issue to be decided by the trier of fact, they may not usurp the jury's role as fact finder in offering such testimony. *People v. Rector*, 248 P.3d 1196, 1203 (Colo. 2011).  In deciding whether expert testimony crosses the line from a permissible comment on an ultimate issue to usurpation of the jury's role as fact finder, we consider a number of factors, including whether

> (1) the testimony was clarified on cross-examination; (2) the expert's testimony expressed an opinion of the applicable law or legal standards and thereby usurped the function of the court; (3) the jury was properly instructed on the law and that it could accept or reject the expert's opinion; and (4) the expert opined that the defendant had committed the crime or that there was a particular likelihood that the defendant did so.

*People v. Baker*, 2021 CO 29, ¶ 32 (citing *Rector*, 248 P.3d at 1203).

### D.    Application

¶ 44    Pope contends that the trial court abused its discretion by admitting Dr. Telck's and Dr. Yang's testimony about whether Tina suffered serious bodily injury because it was extremely prejudicial, exceeded the scope of proper opinion testimony by allowing them to offer legal opinions rather than mere medical opinions, and therefore, usurped the jury's role as a fact finder.

¶ 45    As a threshold matter, we conclude that both Dr. Telck's and Dr. Yang's testimony stepped beyond simple medical opinions and into the realm of legal opinion.  Indeed, they couched these opinions after reading the legal definition of serious bodily injury and then applying it to the specific facts of the case.  That was improper legal opinion testimony.  *See People v. Baker*, 2019 COA 165, ¶ 21

(Expert testimony may be improper if "it assesses witness testimony, indicates a belief in a particular version of the facts, and then applies the law to those facts to make conclusions reserved for the jury."). Moreover, it was unnecessary because the jury could have simply applied Dr. Telck's and Dr. Yang's respective medical diagnoses to Tina's condition and reached a conclusion about whether Tina's symptoms met the definition of serious bodily injury. But we ultimately must ask whether the improper legal opinion usurped the jury's function. To assess this issue, we apply the *Rector* factors.

¶ 46    The supreme court articulated the *Rector* factors as a means of assessing whether a trial court abuses its discretion by permitting a doctor to provide opinion testimony that a medical injury meets the definition of a legal term. *Rector*, 248 P.3d at 1202-04 (assessing whether a trial court abused its discretion by allowing a doctor to testify that injuries met the definition of child abuse); *see also Lawrence v. People*, 2021 CO 28, ¶¶ 37-57 (assessing whether a trial court abused its discretion by allowing a securities commissioner to opine that the defendant misrepresented material facts involving the investment in a security).

¶ 47  A number of the *Rector* factors look to issues that occur during or after the disputed testimony, such as whether the improper opinion testimony was subject to meaningful cross-examination, whether the court properly instructed the jury concerning the substantive legal issues, the court's paramount role in defining the law, the jury's paramount role in deciding the facts and applying them to the law, and the jury's ability to believe some, all, or none of an expert witness's testimony. *Rector*, 248 P.3d at 1203.

¶ 48  But trial courts must make their error assessment before these events occur. Thus, it is a bit of an artifice to suggest that the trial court's assessment of admissibility, and our review of that assessment, should be based on facts that are not known at the time the trial court must decide whether to permit the opinions. Rather, it appears that the *Rector* factors are more properly utilized to assess whether the error associated with admitting improper legal opinion testimony was harmless under the applicable standard of reversal.

¶ 49  Nonetheless, because *Rector* and *Lawrence* articulate and apply the four factors to assess whether the trial court abused its

discretion, we start by applying the *Rector* principles in this manner.

¶ 50    As it relates to the first *Rector* factor — whether the testimony was clarified on cross-examination — Pope's counsel mitigated the improper opinions by clarifying the distinction between a legal opinion and a medical opinion. For example, during Dr. Telck's cross-examination, counsel elicited testimony that the SBI form was created by law enforcement and was not a medical form. She also testified that serious bodily injury was a legal term, not a medical term of art. Pope's counsel also elicited testimony from Dr. Telck about the distinction between medical forms and legal forms by discussing how Dr. Telck consulted with police officers and prosecutors about the SBI form.

¶ 51    Pope's counsel elicited testimony that similarly narrowed Dr. Yang's opinion on cross-examination. When asked, Dr. Yang clarified that serious bodily injury is not a medical term of art and that she is not a legal expert.

¶ 52    As to the second *Rector* factor — whether the expert testimony improperly invaded the function of the court concerning the meaning of serious bodily injury — we conclude for the reasons

stated previously that Dr. Telck's and Dr. Yang's testimony crossed that line. But the improper testimony was significantly mitigated because the trial court properly instructed jurors (1) on the definition of serious bodily injury; (2) that they were the "sole judges of credibility of each witness and the weight given to each witness's testimony"; (3) that they must follow the law as instructed; and (4) that they were the ultimate authority as to whether Tina suffered serious bodily injury. Moreover, Dr. Telck and Dr. Yang appropriately provided the jury with the factual and medical basis for their opinions about serious bodily injury. They both informed the jury that Tina suffered long-term symptoms resulting from the assault, including protracted loss of function of the brain — which they both explained is an organ of the body. This testimony provided the jury with the factual foundation and medical opinions to independently assess the evidence and reach its own conclusions about whether Tina suffered serious bodily injury in light of the court's instructions. Thus, although the experts' opinions on serious bodily injury improperly strayed into legal testimony, those opinions did not usurp the function of the court or the jury.

¶ 53　　Again, the more prudent practice would have been for the prosecutor to limit Dr. Telck's and Dr. Yang's testimony to their medical opinions. *See Lawrence*, ¶ 48 ("[W]e encourage trial judges to assess, on a case-by-case basis, whether such testimony would truly be helpful to the jury before allowing the jury to hear it.").[6] However, in looking at the record holistically and applying the error analysis dictated by *Rector,* we conclude that the improper testimony did not usurp the jury's function. *Rector*, 248 P.3d at 1203. Therefore, the trial court did not abuse its discretion by admitting the testimony. *Id.* at 1204.

¶ 54　　But assuming that error exists, we conclude that the error was harmless for many of the reasons previously articulated. It is true

---

[6] In *Lawrence*, the supreme court warned prosecutors about the propensity and impropriety of asking expert witnesses for improper legal testimony. *Lawrence v. People*, 2021 CO 28, ¶ 44. Given the unique privileges and duties prosecutors possess, it is difficult to understand how this type of improper testimony is repeatedly introduced. *Domingo-Gomez v. People*, 125 P.3d 1043, 1049 (Colo. 2005) ("The prosecutor must therefore scrupulously avoid comments that could mislead or prejudice the jury. The prosecutor's actions during a criminal trial must always comport with the sovereign's goal that justice be done in every case and not necessarily that the prosecution 'win.'"). Trial courts can and should expect prosecutors to honor their professional obligation to discontinue such practices.

that the central contention at trial was whether Tina suffered serious bodily injury as a result of the assault. We also acknowledge that the resolution of this dispute had critical consequences — whether Pope faced sentencing on a misdemeanor conviction versus a substantial prison sentence for conviction of a class 4 felony. Nonetheless, when applying the *Rector* factors, we cannot say that the error affected Pope's substantial rights because the testimony did not substantially influence the verdict or affect the fairness of the trial. *See Hagos v. People*, 2012 CO 63, ¶ 12 (describing the nonconstitutional harmless error standard); *Lawrence*, at ¶ 56 (applying nonconstitutional harmless error to assess any error associated with the admission of improper legal opinions).

¶ 55    The mechanical forces of this assault were largely undisputed and brutal. Pope repeatedly pummeled Tina in the head, blows which she compared to being struck with a jackhammer. Tina's symptomology was immediate and continued for many months. Both Dr. Telck and Dr. Yang opined that these injuries were caused by a concussion that created substantial risk of protracted loss or impairment of the function of an organ of the body, namely Tina's

brain.  As previously discussed, both doctors also provided the jury with the detailed factual and medical evidence that supported their conclusions, thereby allowing the jury to independently assess the evidence based on the court's instructions.

¶ 56    The jury also received opinion testimony from Dr. Miller, a neuropsychologist who Tina's counsel called to discuss the varying types of concussions and the risk of long-term symptoms a patient may experience depending on the degree of concussion.  Though she had not examined Tina or spoken to her concerning her symptoms, Dr. Miller examined her post-assault medical records and reported symptoms.  Dr. Miller also evaluated Tina's past medical diagnoses and the associated prescribed medications, including their potential side effects.  Ultimately, Dr. Miller suggested that Tina's post-assault symptoms were more consistent with her past medical conditions and associated medications, not any concussion resulting from the assault.

¶ 57    But Dr. Miller did not dispute that concussions create a substantial risk of impairing the brain; nor did she dispute that the associated brain injury may be protracted, depending on the seriousness and length of the symptoms.  So the central dispute at

trial was not whether a concussion can result in serious bodily injury. Rather, the central question was whether Tina's protracted symptoms were consistent with the concussive impact of the assault or her past medical conditions. On this issue, Dr. Telck, Dr. Yang, and Dr. Miller provided the jury with the necessary information related to Tina's pre-assault medical history to allow the jury to assess these medical issues from a factual perspective through the lens of the court's jury instructions on the controlling law.

¶ 58 And, as previously detailed, the court thoroughly and accurately instructed the jurors that they alone determined the facts of this case, they were free to accept or reject any testimony, including the opinions of expert witnesses, and the court's instructions were the only proper source for the definition of serious bodily injury. Finally, the jury also received the benefit of thorough cross-examinations testing the veracity of Dr. Telck's and Dr. Yang's testimony and the limits of their expertise and their opinions concerning serious bodily injury.

¶ 59 In sum, the jury received the very types of remediating instructions and evidence that the *Rector* factors contemplate as

mitigating the impact of improper expert legal opinion. Given these circumstances, we cannot say that the improper admission of Dr. Telck's and Dr. Yang's testimony that Tina suffered serious bodily injury substantially influenced the verdict or undermined the fairness of the trial. *Hagos*, ¶ 12. Accordingly, any error in admitting their opinions was harmless. *See People v. Rock*, 2017 CO 84, ¶ 22 (error is harmless unless "there is a reasonable probability that it contributed to the defendant's conviction").

## V. Confrontation Clause Claim

¶ 60 Finally, Pope contends that the trial court reversibly erred and violated his rights under the Confrontation Clause by restricting his counsel from cross-examining Tina about their pending marital dissolution. We discern no error.

### A. Additional Facts

¶ 61 In March 2020, Tina filed to dissolve their marriage after Pope's arrest. While Pope was incarcerated, Tina allegedly agreed to hold off on dissolution proceedings, to retain control of Pope's personal property, and to manage his finances until his release in exchange for being awarded their marital home. Tina's dissolution counsel mailed Pope a document that reflected this agreement. But

Pope declined to sign the proposal. The People moved in limine to prevent the defense from introducing evidence of the parties' dissolution and related negotiations on the basis that it was irrelevant and should be excluded under CRE 403 because the probative value of the evidence was substantially outweighed by the danger of unfair prejudice and could confuse the jury.

¶ 62 Defense counsel responded that granting the People's motion would violate Pope's Sixth Amendment right to confrontation and that he had a broad right to cross-examine Tina about her motive, bias, and interest, including the financial benefit she stood to gain from the marital dissolution and Pope's incarceration.

¶ 63 The trial court agreed, over defense counsel's objection, that evidence of the dissolution proceedings was not relevant to Pope's criminal matter and even if the evidence was relevant, it was properly excluded under CRE 403.

¶ 64 At the conclusion of the People's evidence, defense counsel objected again to the court's finding and asked it to take judicial notice of the dissolution proceedings on the basis that the prosecution opened the door by leading the jury to believe that Tina and Pope were still married. She reasoned that jurors may

incorrectly conclude that Tina returned home to Pope and that would confuse them. The trial court again denied defense counsel's motion after finding that the dissolution proceedings had no relevance and that even if the evidence was relevant, the probative value was substantially outweighed by the risk of prejudice or confusion and therefore should also be excluded under CRE 403.

### B. Standard of Review and Preservation

¶ 65    We review a trial court's evidentiary rulings for an abuse of discretion. *Campbell*, ¶ 21. The parties dispute whether harmless error or plain error applies. However, because we discern no abuse of discretion, we need not decide which standard applies.

### C. Applicable Law

¶ 66    "The Sixth Amendment right to confrontation and the Fifth Amendment right to due process of law require only that the accused be permitted to introduce all relevant and admissible evidence." *Id.* at ¶ 68 (quoting *People v. Harris*, 43 P.3d 221, 227 (Colo. 2002)). A Confrontation Clause violation may exist if a defendant "was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on

31

the part of the witness." *Kinney v. People*, 187 P.3d 548, 559 (Colo. 2008) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 680 (1986)).

¶ 67    However, a criminal defendant's right to cross-examination is not unlimited.  CRE 611(b) ("Cross-examination should be limited to the subject matter of the direct examination and matters affecting the credibility of the witness.").  As it relates to the intersection between the Confrontation Clause and cross-examination, trial courts have wide latitude to place reasonable limits on cross-examination due to concerns about "prejudice, confusion of the issues, the witness' safety, or interrogation which is repetitive or only marginally relevant." *Merritt v. People*, 842 P.2d 162, 166 (Colo. 1992) (quoting *Delaware*, 475 U.S. at 679).

¶ 68    Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  CRE 401.  Relevant evidence may be excluded, however, "if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  CRE 403.

## D. Application

¶ 69 Pope contends that his assault charge and the impending dissolution were intertwined because if the jury was aware that Tina potentially had a financial incentive for Pope's incarceration, it may have evaluated her credibility differently. Thus, Pope contends that the trial court's ruling was an abuse of discretion because it excessively limited his ability to effectively cross-examine Tina.

¶ 70 The People argue that the trial court did not abuse its discretion by preventing Pope from bringing up evidence of the marital dissolution because it was not relevant to whether Pope caused Tina serious bodily injury. We agree.

¶ 71 As discussed, evidence is relevant if it has "any tendency" to make a consequential fact "more or less probable." CRE 401. The marital dissolution had nothing to do with the criminal charges. It is undisputed that Pope repeatedly struck Tina. The issue during the trial was the extent of the harm caused. And Pope fails to show how the dissolution proceedings, which Tina commenced months after the assault, were relevant to Tina's injuries. To the extent he is arguing that their preliminary discussions about the allocation of marital property gave Tina a motive to lie, that argument was

33

foreclosed when Pope rejected the proposal. And Pope provides no explanation how his incarceration would have otherwise impacted the dissolution proceedings.

¶ 72 Thus, even if evidence related to the dissolution was marginally relevant, the trial court correctly found that it should be excluded under CRE 403 because it had significant potential to needlessly confuse the jury and because its relevance was marginal at best. It necessarily follows that the trial court did not abuse its discretion because the limitation did not unreasonably limit Pope's right to cross-examine Tina.

## VI. Disposition

¶ 73 The judgment is affirmed.

JUDGE TOW and JUDGE PAWAR concur.